**In re Shenite GREEN, d/b/a The World in Living Color, Debtor.**

No. 06–11591.

United States Bankruptcy Court, N.D. New York.

Aug. 29, 2007.

Barbaruolo Law Firm, P.C., Barbara Whipple, Esq., Latham, NY, Attorneys for the Debtor.

Andrea E. Celli, Esq., Albany, NY, Chapter 13 Standing Trustee.

## MEMORANDUM–DECISION AND ORDER

ROBERT E. LITTLEFIELD, JR., Bankruptcy Judge.

Before the court is the objection to the Chapter 13 Plan of Shenite Green ("Debtor") filed by Andrea E. Celli, Esq., Chapter 13 Standing Trustee ("Trustee"). The court has jurisdiction over this core matter pursuant to 28 U.S.C. §§ 157(a), (b)(1), (b)(2)(L), and 1334.[1]

### Facts

The parties have stipulated to the relevant facts.[2] To briefly summarize, the Debtor filed a voluntary chapter 13 petition on June 28, 2006. On the same day, the Debtor filed her plan, schedules, and Statement of Current Monthly Income and Calculation of Commitment Period and

---

1. The remaining statutory references are to the Bankruptcy Code 11 U.S.C. §§ 101 to 1532, as amended by the Bankruptcy Abuse Prevention and Consumer Protection Act of 2005 ("BAPCPA"), unless otherwise noted.

2. The court assumes familiarity with the Joint Stipulation of Facts dated November 3, 2006 (No. 11) and Addendum to Stipulated Facts dated August 20, 2007 (No. 23).

Disposable Income (Official Form B22C) known as the means test. The Debtor filed an Amended Form B22C on November 14, 2006. (No. 12.) Pursuant to the information contained on the Debtor's Amended Form B22C, the Debtor is an "above median debtor." [3] Amended Form B22C also indicates that the Debtor has negative monthly disposable income of $135.84 while her schedule J (Current Expenditures) shows monthly net income of $215.43. The Debtor acknowledges on her Amended Form B22C that her applicable commitment period ("ACP") based on her income is 60 months. In her plan, the Debtor proposes to pay $215 per month for a term of 36 months. The Trustee filed her objection to the Debtor's plan on September 28, 2006. The court heard oral argument on the Trustee's objection on October 5, 2007. At the conclusion of oral argument, the court requested memoranda from the parties. The final brief was filed on February 26, 2007, at which time this matter was taken under advisement.

### Arguments

The Trustee's principal objection to the Debtor's plan is that the Debtor fails to provide for the submission of all her disposable income pursuant to 11 U.S.C. § 1325(b)(1)(B). More specifically, the Trustee objects to the Debtor proposing a plan with a term of 36 months when the statutory applicable commitment period ("ACP") for an above median debtor is 60 months. The Trustee states that the plain language of § 1325(b)(4) regarding the ACP leads to the inescapable conclusion that an above median debtor must commit to a 60 month plan unless all allowed unsecured creditors will be paid in full.

The Debtor responds arguing that the Trustee's position ignores the statute's definitional directive that disposable income [4] refers to "current monthly income," [5] less certain expenses. The Debtor relies upon *In re Alexander*, 344 B.R. 742 (Bankr.E.D.N.C.2006), for the proposition that " '[d]ebtors with no disposable income under the new law have no projected disposable income.' *Id.* at 750." (Debtor's Mem. of Law 4 (No. 18).) The Debtor asserts that the *Alexander* court further held that because there is no disposable income there is no ACP as that term is relevant only ' "with regard to the required payments of projected disposable income ... it simply does not come into play where no projected disposable income must be taken into account.' *Id.* at 751." (Debtor's Mem. of Law 4.) The Debtor states that she is outside the ambit of § 1325(b)(1)(B) because she has negative disposable income. The Debtor concludes that although she is eligible to file chapter 7, she has chosen to file chapter 13 in an attempt to repay creditors. The Debtor believes the court should encourage her and other like situated debtors to "do the right thing" by confirming her 36 month plan. *Id.* at 5.

**3.** Federal Rule of Bankruptcy Procedure 1007(b)(6) requires that all chapter 13 debtors complete Parts I and III of Form B22C to calculate a debtor's current monthly income and to determine whether a debtor's annualized current monthly income is above or below the median family income of similarly-sized households for the applicable state.

**4.** Disposable income is now defined "[f]or purposes of [§ 1325(b)]" as "current monthly income ... other than child support pay-

ments, foster care payments, or disability payments for a dependent child ... less amounts reasonable necessary to be expended...." 11 U.S.C. § 1325(b)(2).

**5.** "Current monthly income" is defined in § 101(10A) as the average monthly income that a debtor receives during the 6–month period prior to the commencement of a bankruptcy case less certain benefits (e.g. social security) not applicable here.

### Discussion

█ The issue before the court is whether an above-median debtor with negative disposable income may confirm a 36 month plan. As with many issues that arise under BAPCPA, the answer is not as straight forward as the question presented. The two statutory provisions that need to be examined are §§ 1322(d) [6] and 1325(b)(1)(B). Section 1322(d) is not an impediment to confirmation of the Debtor's plan because it provides that the maximum term for an above median debtor may not exceed 5 years. The debtor's 36 month plan does not run afoul of that proscription.

Section 1325(b)(1)(B) is more complicated. Pre–BAPCPA, the statute provided that upon an objection by the trustee or the holder of an allowed unsecured claim, a plan could not be approved unless the objecting creditor's claim would be paid in full or all of the debtor's projected disposable income would be committed to the plan for three years. Pre–BAPCPA "disposable income" was defined as income not reasonably necessary for the maintenance or support of the debtor or a dependent of the debtor and, if the debtor were engaged in business, for the payment of expenditures necessary for the continuation, preservation and the operation of such business. A debtor's disposable income was then projected over the life of the plan. The test was relatively uncomplicated and emphasis was placed on judicial interpretation and discretion as to what was or was not "reasonably necessary." The "bargain was fair and it was easy to understand." *In re Davis*, 348 B.R. 449, 452 (Bankr. E.D.Mich.2006). The focus was on the debtor's schedules I (Current Income) and J (Current Expenditures) to determine whether the requirements of § 1325(b) were met. Lifestyle decisions on everything from tobacco usage to private school tuition were scrutinized.

The beginning of the process has not changed. Section 1325(b) is still triggered by an objection from the Trustee or an unsecured creditor. If the objection is properly put before the court, § 1325(b)(1) requires that one of two conditions must be satisfied:

(A) the value of the property to be distributed under the plan on account of such claim is not less than the amount of such claim; or

(B) the plan must provide that all of the debtor's projected disposable income to be received in the applicable commitment period beginning on the date that the first payment is due under the plan will be applied to make payments **to unsecured creditors** under the plan.

11 U.S.C. § 1325(b)(1)(A) and (B)(emphasis added).

BAPCPA, however, took the relatively simple application of § 1325(b) and rendered it a murky stew of conflicting judicial opinions about the plain language meaning of common words and phrases contained in the statute itself and the Congressional intent behind it. Section 1325(b)(1)(B), as amended, unlike the old law, is now strictly concerned only with payments to unsecured creditors. Thus, in many instances, the § 1325(b)(1)(B) projected disposable income payment will only be a portion of a debtor's total plan payment. If all the debtor's projected disposable income is to be tendered to the unse-

---

6. 11 U.S.C. § 1322(d) provides that for an above median debtor, "the plan may not provide for payments over a period that is longer than 5 years," and for a below median debtor, "the plan may not provide for payments over a period that is longer than 3 years, unless the court, for cause, approves a longer period, but the court may not approve a period that is longer than 5 years."

cured creditors, none of these funds will reach other creditor classes (e.g.secured, administrative, etc.). A debtor must use other funds that have survived the Form B22C scrutiny to complete the payment to be received and disbursed by the Chapter 13 Trustee.

Unless an objecting creditor's claim may be separately classified, (*see* 11 U.S.C. § 1322(a)(3) and (b)(1)), or the plan proposes to pay all unsecured creditors in full, a debtor will not be able to satisfy the first condition. More likely, the debtor will elect to commit projected disposable income for the ACP.

■ When a statute's language is plain, the sole function of the court—at least where the disposition required by the text is not absurd—is to enforce it according to its terms. *Lamie v. U.S. Trustee,* 540 U.S. 526, 533, 124 S.Ct. 1023, 157 L.Ed.2d 1024 (2004). The ACP is defined in § 1325(b)(4) as follows:

(4) For purposes of this subsection, the 'applicable commitment period'—

(A) subject to subparagraph (B), shall be—

(i) 3 years; or

(ii) not less than 5 years, if the current monthly income of the debtor and the debtor's spouse combined, when multiplied by 12, is not less than—

(I) in the case of a debtor in a household of 1 person, the median family income of the applicable State for 1 earner;

(II) in the case of a debtor in a household of 2, 3, or 4 individuals, the highest median family income of the applicable State for a family of the same number or fewer individuals; or

(III) in the case of a debtor in a household exceeding 4 individuals, the highest median family income of the applicable State for a family of 4 or fewer individuals, plus $525 per month for each individual in excess of 4; and

(B) may be less than 3 or 5 years, whichever is applicable under subparagraph (A), but only if the plan provides for payment in full of all allowed unsecured claims over a shorter period.

11 U.S.C. § 1325(b)(4).

■ The language of § 1325(b)(4) is unambiguous and vanilla plain—the ACP is three or five years [7] depending on income, unless the plan provides for payment in full of all allowed unsecured claims over a shorter period. Because ACP is only income driven, every chapter 13 case will have an ACP component.[8] The parties stipulate that the Debtor is above median; thus, her ACP is five years. This coincides with the ACP derived on Part II of the Debtor's Amended Form B22C. The more pressing issue is whether the ACP component retains any relevance after it is inserted into the overall superstructure of § 1325(b)(1)(B). There are two other variables from that section that must be examined to address that issue: "projected disposable income" and "unsecured creditors." If neither of those variables exist, the § 1325(b)(1)(B) formula loses its mean-

---

**7.** Section 1325(b)(4)(A)(ii) indicates that the ACP for an above median debtor "shall be not less that five years." However, § 1322(d) states that for an above median debtor the plan length "may not exceed five years." It is assumed all parties can agree that "shall be not less than five years" and "may not exceed five years" means five years.

**8.** Once "annualized current monthly income" is computed in Part III of Form B22C and compared with the applicable median income for the applicable state, a debtor's ACP is merely a "check the box" affair at line 17 of Form B22C. This result is then transferred to page 1 of the form. The ACP is either 3 or 5 years.

ing. In other words, we need income to be received and creditors to be paid if the ACP, whether 3 or 5 years, is to have any significance. If there are no unsecured creditors, § 1325(b)(1)(B) is rendered obsolete. Similarly, if there is no projected disposable income to be received, the statute has no more meaning than if there were no creditors to be paid. It appears that many courts may be confusing the ACP under § 1325(b)(1)(B) with the term of the plan as provided for in § 1322(d). They are not necessarily synonymous. All plans have a § 1322(d) term, and in some cases this term will be the same as the § 1325(b)(1)(B) ACP. However, it must be remembered that the ACP is not the actual term of the plan, but only a subset of the term.

■ The parties have stipulated that the Debtor has no disposable income; however, the parties differ on whether there is "projected disposable income." The phrase "projected disposable income" is not defined under BAPCPA and has generated much judicial scrutiny which may be grouped into two basic camps. The first camp's position is articulated in *Alexander*, 344 B.R. 742. In that case, Judge Leonard held that (1) the calculation of disposable income is, as § 1325(b)(2) dictates, historical in nature, based on CMI and not schedules I and J; (2) to calculate projected disposable income one need only take the calculation mandated by § 1325(b)(2) and "do the math;" and (3) the ACP is three to five years depending on the debtor's income, unless the debtor fully pays unsecured claims over a shorter period; however, this concept does not come into play if there is no disposable income. *Id.*

For the *Alexander* court, the strict formula of § 1325(b) is the correct approach. Several courts have adopted this reasoning. *See, e.g., In re Austin*, 372 B.R. 668 (Bankr.D.Vt.2007); *In re Farrar–Johnson,* 353 B.R. 224 (Bankr.N.D.Ill.2006); *In re Rotunda,* 349 B.R. 324 (Bankr.N.D.N.Y. 2006); *In re Barr,* 341 B.R. 181 (Bankr. M.D.N.C.2006).

As represented above, not all courts have sided with Alexander and its progeny. *See e.g., In re Kibbe,* 361 B.R. 302 (1st Cir.BAP2007); *In re Hardacre,* 338 B.R. 718 (Bankr.N.D.Tex.2006); *In re Jass,* 340 B.R. 411 (Bankr.D.Utah 2006). In *Kibbe,* the first appellate voice on the subject, the Bankruptcy Appellate Panel for the First Circuit stated:

> We agree with the bankruptcy court that "projected disposable income" as set forth in § 1325(b)(1)(B) must be grounded in the Debtor's anticipated income … during the term of her plan. And we agree with the reasoning in *Jass* that Form B22C must at least be the starting point for any determination of "projected disposable income." In the event that a debtor's "current monthly income" as set forth by Form B22C is substantially the same as the actual current income at the time of confirmation of the plan, the inquiry begins and ends with Form B22C. But where, as here, the "current monthly income" amount is not true to the debtor's *actual* current income, courts should assume that Congress intended that they rely on what a debtor can realistically pay to creditors through his or her plan and not on any artificial measure. Attaching the word "projected" to a historical calculation assumes, without justification, that a debtor's circumstances will not change after the date of case commencement or during the plan commitment period. Life informs otherwise.

*In re Kibbe,* 361 B.R. at 312.

The Kibbe court comments in a footnote that

We respectfully reject the view espoused in *Barr* and its adherents that the term "projected" is a synonym for "multiplied." Congress was not hesitant in using the term "multiplied" when the context so demanded. *See, e.g.,* §§ 727(a)(2)(A)(I), and 1325(b)(3) and (4). The word "multiplied" is quite different from the word "projected." The former requires only mathematical acumen; the latter, mathematic acumen adjusted by deliberation and discretion.

*Id.* n. 9.

Thus, *Kibbe*, in contrast to *Alexander*, would have us use the debtor's actual income under the theory that the Congressional definition of disposable income is "only a starting point." There are several problems with the *Kibbe* analysis. First, by focusing on the words "projected," "to be received," "beginning on the date," and "effective date of the plan," and ignoring the Congressional definition of "disposable income," that clause becomes complete surplusage in violation of the basic tenants of statutory construction. Unless "projected disposable income" is related to "disposable income," § 1325(b)(2) is nothing more that a bizarre curiosity, a hanging definition with no meaning, relevance or importance. By utilizing the *Alexander* court's interpretation of "taking the calculation and doing the math," (344 B.R. at 749), there is meaning to the future oriented words of § 1325(b)(1)(B), including the now infamous "projected," as well as the definition of "disposable income" under § 1325(b)(2).

As Chief Judge Gerling observes in *Rotunda*

The argument that Congress intended something more when it referred to "projected" in Code § 1325(b)(1)(B) fails to address the fact that Congress defined "disposable income" *after* that provision, in Code § 1325(b)(2). The first subsection, Code § 1325(b)(1)(B) first makes reference to "projected disposable income" and then the next subsection, specifically Code § 1325(b)(2), goes on to explain what was being "projected," namely, CMI "received by the debtor ... to the extent reasonably necessary to be expended...."

*In re Rotunda,* 349 B.R. at 331.

As Judge Brown notes in *In re Austin,* 372 B.R. 668:

One may question the logic of relying upon historical data, and debate whether it yields a reliable prediction of the Debtors ability to make plan payments, or constitutes the best formula for computing those payments. But such differences of opinion are based on the policy implications of the amended statute and do not make the statutes ambiguous or the result absurd. There is no inherent flaw in calculating disposable income based upon an historical figure, or in using the result of that computation in a forward-looking projection of income through the commitment period. The entire test of § 1325(b)(1)(B) is future-oriented, with use of the words "projected," "to be received," and "will be applied" referring to disposable income—a defined term—that will be rendered by the debtor in the future, *i.e.,* during the course of the commitment period. These terms are not superfluous and they are consistent with each other. In BAPCPA, Congress declared that the historical income data from the six months prior to the filing of the bankruptcy petition is a more reliable indicator of a debtor's future financial situation than the income on the day the debtor filed for bankruptcy relief.... While this may constitute a dramatic change form pre-BAPCPA policy-and a point upon which reasonable minds may differ—it is well within the prerogative

of our Legislative branch to make such changes. It is the role of the Judicial branch to carry them out.

*Id.* at 678.

As further support for the *Alexander* case analysis, one may refer to § 1322(a)(4) which also references the term "projected disposable income." However, unlike § 1325(b), no definition of disposable income is provided. Without the millstone of current monthly income weighing down the term disposable income, projected disposable income takes on its everyday meaning of actual current net income projected into the future. It is also interesting to note that in § 1322(f), the statute specifically references " 'disposable income' under section 1325." When Congress wants actual disposable income as opposed to historic, it makes its wishes known.

As noted previously, § 1325(b), as amended, unlike the old law, is now strictly concerned only with payments to unsecured creditors. If one was to apply the *Kibbe* rationale and compute projected disposable income based upon the Debtor's actual income and expenses reflected on Schedules I and J, all of which must be applied to make payments to unsecured creditors, the Debtor would literally have nothing left for the Trustee to make payments to other classes of creditors.

Finally, *Kibbe* and its ancestors stake their credibility on the Congressional view of disposable income being only a starting place. This totally ignores the fact that:

> Chapter 13 trustees recognized early on that this redefinition of disposable in-

come meant some high-income debtors would pay less than they would have under the variant judicial tests and local legal culture that previously measured the chapter 13 disposable income. The chapter 13 trustees repeatedly made their concerns known *to* Congress, asking the CMI less deduction be a minimum, not the maximum, but no changes were made.

*Alexander,* 344 B.R. at 747 (quoting Marianne B. Cuhane & Michaela M. White, *Catching Can–Pay Debtors: Is the Means Test the Only Way?* 13 Am. Bankr.Inst. L.Rev. 665, 681 (2005)). "As in *Lamie,* 'this alert, followed by the Legislature's nonresponse, should support a presumption of legislature awareness and intention.' *Id.* (quoting *Lamie,* 540 U.S. at 541, 124 S.Ct. 1023, 157 L.Ed.2d 1024)." *Alexander,* 344 B.R. at 748.[9]

■ The *Kibbe* "it's only a starting point" position is enticing, attractive, pragmatic and logical. It makes perfect sense. It would allow the court to customize each case based on the real time realities of the parties in interest at the time of confirmation; in effect, what this court has been doing for over a quarter century. Unfortunately, after years of politics and debate, Congress declined to retain the flexibility of the individualized approach and decided to march in a different direction for whatever reason. Therefore, this court must respectfully disagree with *Kibbe's* analysis and conclusion as contrary to the new BAPCPA world order.

Many may wonder about the reasoning behind the Congressional action of

---

9. Professors Culhane and White draw this conclusion from an email from Henry E. Hildebrand, III, the Chapter 13 Trustee in Nashville, Tennessee. Although this is unorthodox legislative history, the court ascribes great credibility to Trustee Hildebrand, who in addition to serving as Trustee for 25 years, is the long standing Chairman of the Legislative and Legal Affairs Committee for the National Association of Chapter 13 Trustees. With his many years of walking the halls of Congress, if Trustee Hildebrand says it is so, then it is so.

§ 1325(b). Judge Robert Mayer provides an excellent analysis in *In re Winokur*, 364 B.R. 204 (Bankr.E.D.Va.2007):

Congress sought to address the specter of bankruptcy abuse in the Bankruptcy Abuse Prevention and Consumer Protection Act it enacted in 2005 after many years of study and consideration. One area of perceived abuse was that debtors who could make meaningful payments to their creditors were choosing chapter 7 over chapter 13. Another was that those who chose chapter 13 could pay more than they were paying in their chapter 13 plans. There were many different opinions. Academics and others who studied the issues never reached a consensus on the extent of abuse. Estimates varied widely. One approach proposed to resolve these issues was the adoption of objective national standards both to act as a gateway into bankruptcy and to establish the amount of plan payments.

There are two approaches to setting plan payments: case-by-case determinations and standardized determinations. The Chandler Act of 1938 and the Bankruptcy Reform Act of 1978 both opted for individualized treatment of each chapter 13 case. In each bankruptcy case, the chapter 13 trustee examined the facts and circumstances of the debtor's financial affairs to determine on an individual basis what the debtor could afford to pay to his or her creditors. Creditors also had the opportunity to examine the debtor, the plan, and the schedules and to object to confirmation. Based on the chapter 13 trustee's recommendations, creditor objections (if any), the debtor's schedules, and any evidence taken at the confirmation hearing, the court determined if the debtor was devoting his or her actual projected net disposable income to the chapter 13 plan. The other approach is a formula applicable to all debtors. The debtor, the trustee and the court only need the input, mainly the debtor's income. The formula mechanically determines the result, the amount of the plan payment.

Neither approach is perfect. One consequence of the individualized approach is the seeming lack of uniformity and the consequent suspicion-sometimes well justified-that some debtors are taking advantage of the bankruptcy system by not paying everything that they could. One consequence of the formula approach is that it prevents some debtors who want to pay their creditors from succeeding because the computed payment is too much for their particular circumstances. Another consequence is the windfall some debtors receive when the mathematical formula results in a chapter 13 plan payment that is less than the amount that they can afford to pay.

Congress was undoubtedly aware of the tradeoffs between the two approaches. In 1938 and 1978, it chose the first; in 2005, the second. The statutory language is clear. The court has no discretion to substitute its judgment for that of Congress.

*Id.* at 205–06.

Whether it was to set a basic price of admission to Title 11, to limit judicial discretion[10] or to remedy perceived abuse,

---

10. Interestingly, in apparently endeavoring to limit judicial discretion, Congress has tendered great discretion to the Trustee and unsecured creditors. They, and they alone, will decide whether to trigger the application of § 1325(b)(1)(B)'s projected disposable income and applicable commitment period. Neither the court *sue sponte* nor a secured creditor has standing to raise the issue. *See In re Smith*, 100 B.R. 436, 439 (Bankr. S.D.Ind.1989). The more interesting tactical question is what objection, if any, might be

§ 1325(b) provides specific direction for the financial snapshot that is to be developed at confirmation. As stated in *Alexander*;

> As observed by the Honorable Keith M. Lundin, where projected disposable income was a "forward looking concept, requiring bankruptcy courts to 'project' the debtor's income into the future," it has been "transformed by new § 1325(b)(2)." Keith M. Lundin, *Section by Section Analysis of Chapter 13 After BAPCPA*, NC BAR ASSOC. 28th ANNUAL BANKR.INST.31 (2005).

*In re Alexander* at 748.

Regarding the instant case, the court must conclude that because there is no disposable income, there can be no projected disposable income. Without projected disposable income, the court further concludes that in this and similar cases, § 1325(b)(*l*)(B)'s ACP is not germane and does not impose a confirmation impediment. It simply makes no sense to invoke § 1325(b)(1)(B) and its mandates by pointing to a negative number which will not be received, and will result in no dividend, benefit, or protection to the unsecured creditors.[11]

█ In summary, the court holds that (1) the ACP is three to five years depending on income; (2) § 1322(d) and not § 1325(b)(1)(B) controls the term of a plan; (3) negative disposable income results in a debtor not having projected disposable income to commit for the ACP pursuant to § 1325(b)(1)(B); and (4) "disposable income" and "projected disposable income"

framed by a party in interest who does not want to breach § 1325(b)(1)(B)?

11. The court emphasizes that the current case involves a § 1325(a) and (b) confirmation issue. However, it would be difficult and unrealistic to not, at least, contemplate the effect of a post-confirmation modification pursuant to 11 U.S.C. § 1329. Precedent exists for the

are interrelated and are based on historical numbers as mandated in § 1325(b).

Based on the foregoing, the Trustee's objection to confirmation based on the Debtor's proposed plan term not coinciding with her ACP is overruled. Accordingly, the Debtor's plan is confirmed.

It is so ORDERED.

proposition that § 1325(b) does not apply to a § 1329 modification which would mean instead of utilizing the relic of a debtor's historical finances, the court would instead utilize the accuracy of a debtor's current financial picture. Whether to adopt that rational must await another decision on another day.