### In re Kathryn Claire WILLIAMS, Debtor.

### In re JoAnn Birdwell, Debtor.

### In re Russell Keller, Debtor.

### Nos. 07–19962 EEB, 07–22823 EEB, 07–23295 EEB.

United States Bankruptcy Court, D. Colorado.

Sept. 12, 2008.

---

**554**

Loretta A. Burnett, Colorado Springs, CO, for Debtor Kathryn Claire Williams.

John Turner, Colorado Springs, CO, for Debtor JoAnn Birdwell.

Stephen E. Berken, Denver, CO, for Debtor Russell Clark Keller.

N. April Norton, Denver, CO, for Sally Zeman, Chapter 13 Trustee.

## ORDER

ELIZABETH E. BROWN, Bankruptcy Judge.

In each of these cases, the standing Chapter 13 trustee (the "Trustee") objects to plan confirmation on the grounds that the proposed plans fail to use the proper

methodology under BAPCPA[1] to calculate the debtor's projected disposable income and/or the plans fail to provide for payment of all of the debtor's disposable income over the applicable commitment period-five years in these cases. This opinion examines the new amendments to 11 U.S.C. § 1325(b) and in this context addresses: (1) how "projected disposable income" is to be calculated; (2) to whom it is to be paid; (3) whether an above-median income debtor may propose a plan for a duration of less than five years without paying unsecured creditors in full; and (4) whether a plan that satisfies the "projected disposable income" and "applicable commitment period" tests may nevertheless be attacked on a good faith basis under 11 U.S.C. § 1325(a)(3).

## I. FACTS

The relevant facts of these cases are not in dispute. Each of these debtors have current monthly income that exceeds the median family income for a household of the same size in the State of Colorado. The Debtors in each case have "monthly disposable income," as calculated on Official Form 22C (**"Form 22C"**), that is less than the amount of "monthly net income" indicated on their Schedules I and J.

In the Birdwell case, Ms. Birdwell's Form 22C reflects monthly disposable income of $318.09, but her Schedules I and J show monthly net income of $470.99. Ms. Birdwell has proposed a 5-year plan, under which she will pay $340 for 60 months, or a total of $20,400. She proposes to pay her Class Four nonpriority creditors the sum of $15,586, which reflects deductions for her attorney's fees and costs and for

---

**1.** Filed after October 17, 2005, these cases are subject to the provisions of the Bankruptcy Abuse Prevention and Consumer Protection Act of 2005 ("BAPCPA"). Unless otherwise noted, all references to "Section," § , or the "Code" shall refer to Title 11, United States

Code, as amended by BAPCPA. References to the Bankruptcy Code prior to BAPCPA becoming effective are identified in the text as being either "pre-BAPCPA" or "prior to BAPCPA."

the Trustee's compensation. The Trustee objected, asserting that the plan fails to contribute all of the Debtor's projected disposable income to the plan, because it does not propose to pay her Schedule I minus J net income of $470 per month, that the Debtor's Schedule I understates her present income, and that the Debtor's plan payment should increase when her vehicle loan is paid off during the plan period.

In the Keller case, Mr. Keller's Form 22C net income is a negative number. According to his Schedules I and J, his net income is $903.66. His plan proposes to pay $903, but only for a period of 44 months, reflecting total plan payments of $39,732, and only offers to pay $6,712 of this amount to the nonpriority unsecured creditors. The balance is to be paid toward priority claims, including his attorney's fees and costs, the Trustee's compensation, and a substantial priority tax debt. The Trustee has objected to his plan only on the basis that the plan's duration of 44 months does not satisfy the minimum length required by the "applicable commitment period" found in § 1325(b)(1)(B) and (b)(4).[2]

In the Williams case, Ms. Williams' Form 22C also indicates that she has negative "projected disposable income." A review of her Schedules I and J, however, shows that she has monthly net income of $430. In her plan, she has offered to pay the aggregate amount of $13,260. This amount reflects $430 for 12 months, $230 for 4 months, $479 for 8 months, and $279 for 12 months. Thus, the plan's duration is only 36 months. She will pay the nonpriority unsecured creditors only $8,905,

which reflects deductions for her attorney's fees and costs and the Trustee's compensation. Similar to the Keller case, the Trustee has objected to her plan only on the basis of its shorter duration.

## II. DISCUSSION

Section 1325(a) sets forth the requirements for Chapter 13 plan confirmation. Even if a plan meets the requirements of § 1325(a), an objection filed by either a trustee or an unsecured creditor will trigger the additional requirements of § 1325(b)(1). Prior to BAPCPA, § 1325(b)(1)(B) required a plan to provide that:

> all of the debtor's projected disposable income … received in the three-year period beginning on the date of the first payment … will be applied to make payments under the plan.

Congress substantially amended § 1325 through BAPCPA, but made only two changes to the requirement set forth in § 1325(b)(1)(B). First, Congress replaced the words "three-year period" with the words "applicable commitment period." Second, Congress inserted the phrase "to unsecured creditors" immediately before the phrase "under the plan," such that § 1325(b)(1)(B) now provides that if a trustee or unsecured creditor objects to confirmation, then the Court may not approve the plan unless:

> the plan provides that all of the debtor's projected disposable income to be received in the *applicable commitment period* beginning on the date that the first payment is due under the plan will be

---

2. In the Keller case, the Trustee raises an additional plan confirmation objection related to the Debtor's domestic support obligation. The Trustee argues that, if this obligation is in the nature of alimony and if the obligation ends during the term of the plan, there should

be an increase in plan payments. But given the Court's ruling on "projected disposable income" and "applicable commitment period," it is not necessary to reach this additional objection.

applied to make payments *to unsecured creditors* under the plan.

Perhaps most significantly, Congress redefined the term "disposable income" in § 1325(b)(2). The parties in these cases contest the meaning of the phrases "projected disposable income" ("PDI") and "applicable commitment period" ("ACP") in § 1325(b)(1)(B) as amended by BAPCPA.

 In construing the language of § 1325(b)(1)(B), this Court must begin with the language of the statute itself.[3] It is also guided by the principle that "[s]tatutory construction ... is a holistic endeavor. A provision that may seem ambiguous in isolation is often clarified by the remainder of the statutory scheme-because ... only one of the permissible meanings produces a substantive effect that is compatible with the rest of the law."[4]

### A. Calculation of PDI Under BAPCPA

For over two decades, the Code has contained a requirement that a contested Chapter 13 plan apply all of a debtor's PDI toward the payment of creditors. Prior to passage of BAPCPA, determining PDI was typically determined by a relatively straightforward formula. If a debtor accurately reported his income on Schedule I and if the expenses reported on Schedule J were all reasonably necessary, then the difference between Schedule I and Schedule J was the debtor's PDI. Whether an expense was "reasonably necessary" was a determination to be made by the bankruptcy judge. Since the judge's findings were discretionary in nature, some critics characterized the old approach as an "amorphous standard ... produc[ing] determinations of a debtor's 'disposable income' that varied widely among debtors in similar circumstances."[5]

BAPCPA changed this determination by radically altering the definition of "disposable income." A debtor's net income is no longer tied to present income and expenses as set forth on Schedules I and J, but instead is defined as *"current monthly income* received by debtor ... less *amounts reasonably necessary to be expended* ... for the maintenance or support of the debtor or a dependent of the debtor...."[6] "Current monthly income" or "CMI" is defined by the Code to be an average of the actual income received by the debtor during the six months *before* the month of the petition date, subject to certain exclusions.[7] Thus, it is based on historical figures. Although not at issue in these cases, CMI and Schedule I income may also differ because the definition for CMI excludes Social Security benefits and certain payments to victims of terrorism.[8] Schedule I, on the other hand, includes a line item for "Social Security or govern-

---

**3.** *United States v. Kammersell,* 196 F.3d 1137, 1139 (10th Cir.1999) ("[a] federal court must 'give effect to the will of Congress, and where its will has been expressed in reasonably plain terms, that language must ordinarily be regarded as conclusive.'" (quoting *Negonsott v. Samuels,* 507 U.S. 99, 104, 113 S.Ct. 1119, 122 L.Ed.2d 457 (1993))); *United States v. Ron Pair Enters.,* 489 U.S. 235, 240–41, 109 S.Ct. 1026, 103 L.Ed.2d 290 (1989).

**4.** *United Sav. Ass'n of Texas v. Timbers of Inwood Forest Assocs., Ltd.,* 484 U.S. 365, 371, 108 S.Ct. 626, 98 L.Ed.2d 740 (1988) (internal citations omitted).

**5.** *In re Kagenveama,* 527 F.3d 990, 995 n. 2 (9th Cir.2008), *amended by* 541 F.3d 868 (9th Cir.2008).

**6.** 11 U.S.C. § 1325(b)(2) (emphasis added).

**7.** 11 U.S.C. § 101(10A).

**8.** 11 U.S.C. § 101(10A)(B).

ment assistance." [9]

After arriving at CMI, a debtor must then subtract a series of income exclusions and expense deductions to arrive at "disposable income." [10] For present purposes, the most important (and complicated) deduction made from CMI is "amounts reasonably necessary to be expended" for the maintenance or support of the debtor and the debtor's dependents. [11] This amount is determined using a different methodology depending on whether the debtor's CMI is above or below applicable median family income. Where a debtor has an above-median income, the statute requires that "amounts reasonably necessary to be expended" be determined in accordance with § 707(b)(2)(A) and (B). [12] Section § 707(b)(2)(A) is a fairly complex mathematical test, often called the "**Means Test,**" used to determine whether a presumption of abuse arises in Chapter 7 cases. Although an oversimplification, application of the Means Test in the Chapter 13 context can generally be described as subtracting from CMI certain monthly expenses and standard allowances. Many of the deductions, including those for general living expenses, housing, utilities, and transportation, are made in standard amounts set by the IRS and do not reflect amounts actually spent by a debtor. After taking the "Means Test" deductions and making certain other adjustments, an above-median debtor then arrives at a figure that is his or her monthly "disposable income" under § 1325(b)(2). [13]

Given the significant differences between the old "Schedule I minus Schedule J" formula and Form 22C's calculations, it is not surprising a debtor's monthly "disposable income" on Form 22C is quite frequently different (and sometimes significantly different) from the monthly net income listed on Schedules I and J. The deviation can be either higher or lower and can result from differences on either the income or expense side of the calculation. For example, if a debtor was unemployed for most of the six months prepetition, but found a job near the petition date, the debtor's CMI would be substantially lower than her actual income on Schedule I. The opposite may also be true. A change in circumstances may make a debtor's CMI higher than her actual income on the petition date.

The expense side of the equation is similarly subject to variation. A debtor's actual expenses may be higher or lower than the standard expense deductions set by the IRS, which then correlates to similar deviations between Form 22C "disposable income" and actual monthly net income. The Debtors' schedules in these cases illustrate this point. None of the Debtors' CMI varies substantially from their gross income as reported on Schedule I. All of the Debtors' actual Schedule J expenses, however, are lower than the allowed expense deductions on Form 22C. As a result, each of the Debtor's Form 22C "disposable income" is lower than their respective monthly net income figure reported on Schedule J. Indeed, two of the Debtors have monthly "disposable income" of $0 on Form 22C, because the Form 22C calculations resulted in a nega-

---

**9.** Official Form 6I, line 11.

**10.** *See* 6 Keith M. Lundin, *Chapter 13 Bankruptcy* § 467.1 at 467–3 to 467–12 (3d ed.2000 & Supp.2007–1) (describing, with flow chart, the five categories of exclusions and adjustments a debtor must make to get from CMI to disposable income).

**11.** *See* 11 U.S.C. § 1325(b)(2)(A)(I).

**12.** 11 U.S.C. § 1325(b)(3).

**13.** *See* Form 22C at line 58.

tive number. Ms. Birdwell is the only Debtor with a positive Form 22C disposable income figure ($318), which is roughly $150 lower than her monthly net income determined by Schedule I minus Schedule J ($470).

These variations reflect the fundamental difference between the old and new formula—the old formula is based on a debtor's actual financial situation at or near the confirmation date, while the new formula is based on historical income and standard deductions. The new definition of disposable income erects a rigid formula that may bear little or no relationship to a debtor's actual ability to fund a plan. But the elimination of judicial discretion may have been the intent behind this legislative change.[14]

In response to the discrepancies between the Schedule I minus Schedule J figure and the Form 22C calculation, Chapter 13 trustees have argued that a court's interpretation of § 1325(b) should differ depending on whichever interpretation will maximize the distribution to creditors. In other words, they have argued that the Form 22C calculation represents the minimum payment or a "floor."[15] When the Schedule I minus Schedule J net income is higher than the Form 22C figure, as in the present cases, they have argued that the Form 22C figure must be modified to the net income amount reflected on Schedule J.

Understandably, courts have struggled with how to reconcile BAPCPA's new "disposable income" formula with the realities of Chapter 13 practice.[16] The resulting case law is staggering not only in its volume, but also in the great diversity of its holdings. Courts cannot even agree on how to group the case law into recognizable categories.[17] At best, the various decisions can be very broadly categorized into a majority and minority position. But there is great diversity within each position. The minority position generally holds that a debtor's PDI for purposes of § 1325(b)(1) is properly determined solely by the disposable income figure on Form 22C.[18] These courts recognize that use of Form 22C may lead to absurd results in some cases, but nevertheless contend the plain language of the statute requires adherence to the Form 22C calculation. The majority position treats Form 22C's "disposable income" figure as merely a starting point for determining PDI.[19] The

---

**14.** *In re Kagenveama,* 527 F.3d 990, 996 (9th Cir.2008), *amended by* 541 F.3d 868 (9th Cir. 2008) (citing *In re Farrar–Johnson,* 353 B.R. 224, 231 (Bankr.N.D.Ill.2006) (stating that "[e]liminating flexibility was the point: the obligations of [C]hapter 13 debtors would be subject to 'clear, defined standards,' no longer left 'to the whim of a judicial proceeding'")).

**15.** *Id.*

**16.** BAPCPA's changes to § 1325 have been roundly criticized. As one author remarked, "Conceptually and technically, BAPCPA corrupted the disposable income test in § 1325(b) in so many ways it takes restraint not to laugh and cry at the same time." 6 Keith M. Lundin, *Chapter 13 Bankruptcy* § 466.1 at 466–1 (3d ed.2000 & Supp.2007– 1).

**17.** *E.g., In re Barfknecht,* 378 B.R. 154, 158 n. 5 (Bankr.W.D.Tex.2007) (describing seven "schools of thought" on calculation of PDI); *In re Edmunds,* 350 B.R. 636, 641–43 (Bankr. D.S.C.2006) (describing three "approaches" in case law but recognizing conflicts within each category); *In re Mancl,* 381 B.R. 537, 541–42 (W.D.Wis.2008) (describing minority and majority positions and adopting minority).

**18.** *See, e.g., In re Mancl,* 381 B.R. at 541–42; *In re Alexander,* 344 B.R. 742, 748–50 (Bankr. E.D.N.C.2006); *In re Hanks,* 362 B.R. 494, 498 (Bankr.D.Utah 2007).

**19.** *In re Lanning,* 380 B.R. 17 (10th Cir. BAP 2007); *Pak v. eCast Settlement Corp. (In re Pak),* 378 B.R. 257, 268 (9th Cir. BAP 2007); *Kibbe v. Sumski (In re Kibbe),* 361 B.R. 302,

calculation may be modified, the majority position holds, to more accurately reflect a debtor's current financial situation. Courts vary considerably, however, on exactly how and when such modifications may occur.

To date, the only circuit court to address the calculation of PDI under BAPCPA is the Ninth Circuit, in the case of *In re Kagenveama.*[20] In *Kagenveama,* the debtor's Form 22C listed a negative disposable income, while her Schedules I and J projected a monthly net income of over $1,500 per month. The trustee objected to the debtor's proposed plan, arguing her disposable income on Form 22C was merely a starting point and should be adjusted to reflect the debtor's current income and expenses. The bankruptcy court overruled the trustee's objection and held that PDI simply means disposable income as calculated by Form 22C, "projected" or multiplied over the ACP. On appeal, the Ninth Circuit affirmed.

In its analysis, the Ninth Circuit rejected the majority position's construction of the term "projected" in § 1325(b)(1)(B) as allowing modification of the historical figure to reflect present figures. Instead it affirmed the bankruptcy court's construction of "projected" as the equivalent of "multiplied." It based its analysis on both statutory construction and the historical tie that has existed between the terms PDI and "disposable income." It noted that § 1325 uses the term "disposable income" in only two places—§ 1325(b)(1)(B) ("projected disposable income") and § 1325(b)(2) (defining "disposable income")—and held that § 1325(b)(2) would be rendered mere surplusage if it does not define the term "disposable income" as used in § 1325(b)(1)(B).[21] In a pre-BAPCPA decision, *In re Anderson,*[22] the Ninth Circuit had already ruled that PDI did not require a debtor to pay all of his actual future disposable income but only his "disposable income" calculated at the time of confirmation and then "projected" into the future for the required duration of the plan.[23] Thus, "disposable income" has always been linked to PDI in terms of a mere multiplication process.[24] The Court concluded that any change in how PDI is calculated only reflects the change dictated by the new "disposable income" definition; it does not change the relationship between PDI and "disposable income."[25] The Ninth Circuit viewed the change in this definition as reflecting a deliberate departure from the previous flexible standard to a more formulaic approach. It noted that Congress is capable of creating statutory presumptions, as it did in § 707(b)(2), but it did not do so in § 1325. While the Court recognized that BAPCPA's new PDI formula may lead to less favorable results for unsecured creditors, it held that "it is up to Congress, not the courts, to amend the statute."[26]

While it has not yet rendered a post-BAPCPA interpretation of PDI, the Tenth Circuit presently has pending before it an

---

314–15 (1st Cir. BAP 2007); *In re Jass,* 340 B.R. 411 (Bankr.D.Utah 2006).

**20.** *In re Kagenveama,* 527 F.3d 990 (9th Cir. 2008), *amended by* 541 F.3d 868 (9th Cir. 2008).

**21.** *Id.* at 995.

**22.** *Anderson v. Satterlee (In re Anderson),* 21 F.3d 355, 357 (9th Cir.1994).

**23.** *In re Kagenveama,* 527 F.3d at 996 (citing *In re Anderson,* 21 F.3d at 357).

**24.** *Id.* at 995.

**25.** *In re Kagenveama,* 527 F.3d at 995.

**26.** *Id.* at 997.

appeal of an opinion of the Tenth Circuit Bankruptcy Appellate Panel (BAP) in *In re Lanning.*[27] In *Lanning*, the debtor received a buy-out from her employer during the six-month period prior to filing her petition, which resulted in a temporary increase in her monthly income followed by termination of her employment. As a result, the debtor's disposable income as reported on her Form 22C ($1,114) was substantially higher than her actual post-petition monthly net income ($149) reported on Schedules I and J. The debtor proposed a Chapter 13 plan with payments that approximated her actual monthly net income and the trustee objected on the grounds that debtor failed to commit all her PDI to the plan.

After reviewing the majority and minority viewpoints, the BAP adopted a somewhat hybrid position. Relying in part on a Ninth Circuit BAP case that has now been overruled by *In re Kagenveama*, the BAP agreed with those courts that found Form 22C disposable income to be the "starting point" in determining PDI and that "[w]here it is shown that Form B22C disposable income fails accurately to predict a debtor's actual ability to fund a plan, that figure may be subject to modification."[28] But the BAP tethered the court's ability to modify the Form 22C calculation to § 707(b) itself.[29] Section 707(b)(2)(B)(I) allows a Chapter 7 debtor to rebut the presumption of abuse "by demonstrating special circumstances . . . that justify additional expenses *or adjustments of current monthly income* for which there is no reasonable alternative."[30] A Chapter 7 debt-

or seeking to rebut the abuse presumption must "itemize their increased expenses or changes in income, to provide both documentation and a detailed explanation of the 'special circumstances' they claim, and to attest to them under oath."[31] The BAP then concluded:

> Given section 707's similar use of Form B22, we look to that section for guidance in considering a Chapter 13 debtor's claim that a substantial change of circumstances justifies a similar deviation from Form B22C. Therefore, parties contending that a debtor's Form B22C disposable income figure does not accurately project the debtor's future ability to fund a plan must present documentation similar to that required by section 707(b)(2)(B)(ii) in support of their claim. However, we emphasize that deviation from the Form B22C determination of disposable income will be the exception rather than the rule.[32]

The BAP affirmed the bankruptcy court's ruling that allowed the debtor to calculate her PDI based on her Schedule I income amount instead of CMI.

 It is easy to describe *Lanning* and *Kagenveama* as contrary holdings. Admittedly, these courts disagree on the proper construction to be given to the term "projected" and the existence of a presumption in § 1325(b). But it is also possible to harmonize these decisions. This Court agrees with and adopts the Ninth Circuit's reasoning in terms of its construction of the term "projected" and its analysis of the pre-BAPCPA relation-

---

**27.** *In re Lanning*, 380 B.R. 17 (10th Cir. BAP 2007), *appeal docketed*, No. 08–3009 (10th Cir. Jan. 14, 2008).

**28.** *Id.* at 25.

**29.** *Id.*

**30.** 11 U.S.C. § 707(b)(2)(B)(I) (emphasis added).

**31.** *In re Lanning*, 380 B.R. at 25.

**32.** *Id.* (referring to "Form B22C," which was the interim form that became Form 22C once the BAPCPA official forms were adopted).

ship between PDI and "disposable income." But this Court finds support within in § 1325 for the Tenth Circuit BAP's ruling that a debtor may demonstrate special circumstances for adjustment of the Form 22C calculation. It is not necessary to treat the Form 22C figure as a "presumption" in order to justify an adjustment of the Form 22C amount.

Section 1325 expressly incorporates the "special circumstances" exception found in § 707(b)(2)(B). In § 1325(b)(3), Congress defined "amounts reasonably necessary to be expended" for above-median income debtors. It states that such amounts "shall be determined in accordance with subparagraphs (A) and (B) of section 707(b)(2)." This statute could have only referred to the Means Test set forth in § 707(b)(2)(A), with its provisions for the calculation of both income and expenses. Instead, it also expressly incorporated the special circumstances test of § 707(b)(2)(B). Section 707(b)(2)(B) allows a debtor to demonstrate special circumstances to "justify additional expenses or adjustments of current monthly income for which there is no reasonable alternative." This language allows for adjustments to either the income or the expense side of the equation. By grafting this exception to the Means Test formula into § 1325(b), Congress has left the door open to a Chapter 13 debtor to demonstrate the necessity of an adjustment to the Form 22C calculation due to either a change in income or a need for additional expenses. Admittedly, this is a stringent test and the statute sets forth a number of hurdles that a debtor must clear before he can satisfy the exception. But the possibility exists, in both Chapter 7 and Chapter 13 cases, for a debtor to be able to modify the otherwise rigid formula.

Undoubtedly, the Ninth Circuit did not acknowledge this limited ability to modify the Form 22C calculation because it was not the *Kagenveama* debtor, but the Chapter 13 trustee, seeking to modify the formula. This raises the question of whether someone other than a debtor may demonstrate "special circumstances" to modify the Form 22C figure. The Trustee in the Birdwell case has argued in the alternative that she has established "special circumstances" for modifying Ms. Birdwell's Form 22C calculation by demonstrating Ms. Birdwell's ability to fund a higher plan payment. In *Lanning*, the BAP referred to the ability of the "parties" to seek to modify the Form 22C figure.[33]

█ This Court does not find support in either § 707(b)(2)(B) or § 1325(b)(3) for the proposition that a trustee or a creditor may invoke the special circumstances exception. Section 707(b)(2)(B) is replete with references to the debtor and, by its very context, provides an exception available only to the debtor because only a debtor would have a need to rebut a presumption of abuse. Any reference in *Lanning* to the ability of a party other than the debtor to utilize this exception is, with all due respect, merely dictum. In *Lanning*, it was not the trustee or a creditor seeking to rely on the exception. The *Lanning* debtor sought to adjust her income due to a dramatic decrease in her postpetition income.

Consequently, this Court holds that a debtor's disposable income is determined in accordance with Form 22C. The debtor alone may seek to modify this figure by invoking the special circumstances test of § 707(b)(2)(B). The resulting figure is then "projected" or multiplied over the ACP. The ability of a trustee or an unsecured creditor to object to a plan that

33. *Id.*

otherwise satisfies the formula set forth in § 1325(b) is limited to a challenge under § 1325(a), which is explored in further detail below.

■ This construction of the statute does not lead to an absurd result or a windfall to these Debtors, as is demonstrated by the particular objection raised by the Trustee in the Birdwell case. In Birdwell, the Trustee has argued that her plan must contain a "step-up" in the amount of her payment when her auto loan is repaid during the life of the plan. But the Form 22C calculation has already accounted for the early repayment of this loan. The deduction for Ms. Birdwell's auto loan on Form 22C is determined by § 1325(b)(3), which in turn refers to § 707(b)(2)(A)(iii). That section provides in relevant part that a debtor may deduct from current monthly income "the total of all amounts scheduled as contractually due to secured creditors in each month of the 60 months following the date of the petition ... divided by 60." [34] For example, if a debtor owed $24,000 on a car loan on the petition date, and was contractually obligated to pay $500 per month for 48 months, her deduction would not be the actual amount she had to pay ($500), but $24,000 divided by 60 months, or $400. This formula gives her a smaller deduction, rather than her full contractual payment for 48 months, followed by an increase in plan payments beginning in the 49th month, to account for the earlier termination of the loan.[35] As a result, the Court overrules the Trustee's objection to the Birdwell plan to the extent it is based on the failure to provide a "step-up" in payment on the completion of an obligation during the life of the plan. The Court further overrules the Trustee's objection that Ms. Birdwell must offer the net income indicated on her Schedule J.

## B. PDI Must be Paid to "Unsecured Creditors"

BAPCPA also amended § 1325(b) to insert three new words, "to unsecured creditors." Specifically, the statute now mandates that a debtor's PDI, committed to be paid under a plan, is to be paid "to unsecured creditors." While seemingly innocuous, these three little words present the most challenging interpretation question posed by the amendments to this statute.

■ At the outset, the Court notes that the Trustee has not objected to these plans on the basis of the proposed recipients of the Debtors' PDI. But once either a trustee or an unsecured creditor lodges an objection to confirmation, *on any basis,* then this Court may not confirm it unless it satisfies the requirements of § 1325(b). In other words, there is only one prerequisite to triggering the requirements of § 1325(b): "[i]f the trustee or the holder of an allowed unsecured claim objects to the confirmation of the plan, then the court may not approve the plan unless...." The objection may be limited in scope, such as the Trustee's present objection in Birdwell, or it may be only an objection under § 1325(a). Whatever the objection, if lodged by either a trustee or an unsecured creditor, it requires the Court to ensure that all of § 1325(b)'s requirements are met, including the requirement that PDI must be paid "to unsecured creditors."

■ Thus, although no party has raised this issue, the Trustee's objections require the Court to interpret this new language. Must a debtor pay her "pot" of funds that represents PDI multiplied by the ACP only to nonpriority unsecured creditors?

---

34. 11 U.S.C. § 707(b)(2)(A)(iii).

35. *See In re Brady,* 361 B.R. 765 (Bankr. D.N.J.2007).

May it be paid to both priority and nonpriority unsecured creditors? Does this phrase include both pre-and post-petition unsecured creditors? Of the few reported decisions addressing this issue, none have accounted for the definition of "creditor" set forth in § 101(10)(A), which states that it refers to an "entity that has a claim against the debtor that arose at the time of or before the order for relief concerning the debtor." [36] Thus, by definition, this term would only include creditors holding prepetition claims. As a result, if the Court were to apply the § 101(10)(A) definition to § 1325(b)'s new phrase, it would indicate that a debtor could use PDI to pay prepetition priority claims, but not administrative expense priority claims.

Pre–BAPCPA, Chapter 13 plans routinely paid the debtor's net income figure first toward priority claims in the order set forth in § 507—which included both pre-petition claims (such as past due child support and priority taxes) and postpetition or administrative expenses (such as attorney's fees and trustee's compensation)—and then applied the balance to the nonpriority unsecured creditor class (referred to in these plans as **the "Class Four" creditors**). In each of the three plans before this Court, the Debtors propose to follow this pre-BAPCPA practice. For example, in the Keller case, the Debtor has committed almost $40,000 in payments, but proposes to pay approximately $27,000 toward his priority tax debts, and after payment of administrative expenses,

only $6,712 will remain to be shared among Mr. Keller's Class Four creditors.

Courts addressing this issue have reached varying results. In *In re Wilbur*,[37] the court addressed the meaning of "unsecured creditors" in the case of an above-median income debtor. It noted that Form 22C already subtracts the payments to secured and priority creditors before arriving at PDI. It then concluded that, "[i]f the Court interpreted 'unsecured creditors' to include priority unsecured creditors, the debtor would, in effect, be double-counting." [38] Allowing the debtor to double-count, the *Wilbur* court found would be "an absurd result." [39] It therefore held that "unsecured creditors" refers to nonpriority unsecured creditors only.

In *In re Amato*,[40] the court pointed out that not all priority claims are accounted for in Form 22C. There is no line item deduction in the form for the Chapter 13 debtor's attorney's fees and costs. Based on this omission, the *Amato* court felt constrained by the form's language and held that "neither the Trustee's commission nor the Debtors' attorney's fees in this case should be deducted from the projected disposable income. . . ." [41] The court in *In re Puetz*,[42] rejected this conclusion and held that, based on this omission from the form, PDI may be used to pay all priority and nonpriority claims not otherwise accounted for in the form.[43]

The Court agrees that Form 22C does not explicitly account for attorney's fees,

---

**36.** *See In re Wilbur,* 344 B.R. 650 (Bankr. D.Utah 2006); *In re Amato,* 366 B.R. 348 (Bankr.D.N.J.2007); *In re Puetz,* 370 B.R. 386 (Bankr.D.Kan.2007); *In re McDonald,* 361 B.R. 527 (Bankr.D.Mont.2007); *In re Echeman,* 378 B.R. 177 (Bankr.S.D.Ohio 2007).

**37.** 344 B.R. 650 (Bankr.D.Utah 2006).

**38.** *Id.* at 654.

**39.** *Id. See also In re McDonald,* 361 B.R. 527 (Bankr.D.Mont.2007).

**40.** 366 B.R. 348 (Bankr.D.N.J.2007).

**41.** *Id.* at 353.

**42.** 370 B.R. 386 (Bankr.D.Kan.2007).

**43.** *Id.* at 392.

but the statute itself does. Section 707(b)(2)(A)(iv) allows an above-median income debtor to subtract *all priority claims* in arriving at PDI. Such deductible priority claims must include those expenses given administrative expense priority by § 503. More specifically, § 503(b)(2) provides that those "actual, necessary costs and expenses of preserving the estate" entitled to administrative expense priority treatment include all awards made under § 330(a). Section 330(a)(4)(B), in turn, allows a court to award a Chapter 13 debtor's counsel compensation "for representing the interests of the debtor in connection with the bankruptcy case...." Thus, by allowing for the subtraction of all priority claims, § 707(b)(2) does allow a Chapter 13 debtor to use postpetition income to pay attorney's fees, despite the omission of this line item from Form 22C. In addition, § 1322(a)(2) and § 1326(b) mandate the payment of all priority claims, including these fees.

Unfortunately, the provision in § 707(b)(2) for the payment of priority claims is only applicable to above-median income debtors. Below-median income debtors are not covered by the expense calculations set forth in § 707(b)(2). Instead they remain subject to the pre-BAPCPA method of calculating "reasonably necessary" expenses, which means reliance on Schedule J.[44] So, below-median income debtors derive their PDI by calculating their CMI and then subtracting only Schedule J expenses.[45] Schedule J, however, makes no provision for such priority claims as attorney's fees and a trustee's compensation.

This presents the Court with an impossible choice. Should the Court adopt an interpretation that excludes priority claimants to avoid double-counting these claims to the detriment of the nonpriority creditors in cases involving above-median income debtors? Or should the Court interpret "unsecured creditors" as including both priority and nonpriority unsecured creditors in order to make Chapter 13 feasible for below-median income debtors? Faced with this dilemma, another court suggested in a footnote that:

> [T]o avoid the dueling absurd results of either allowing above-median family income debtors to double-count their priority unsecured claim before paying nonpriority unsecured claims or making below-median family income debtors' plans unfeasible because they have no source of income besides "disposable income" from which to pay priority unsecured claims .... *the effective result [should be] the same for all debtors— priority unsecured claims can be counted once, no more, no less, in determining which funds are left for nonpriority unsecured creditors.*[46]

This Court agrees that the only sensible interpretation is one which allows the subtraction of priority claims for all debtors, "once, no more, no less." This interpretation would also give meaning to the insertion of these three new words in the statute. If the Court were to hold that "unsecured creditors" refers to both types of unsecured creditors, without any prohibition on double counting, it would render the addition of "to unsecured creditors" mere surplusage. If Congress had intended to allow the payment of both priority and nonpriority creditors from PDI,

---

44. 11 U.S.C. § 1325(b)(2).

45. *See In re Echeman,* 378 B.R. 177, 182 n. 7 (Bankr.S.D.Ohio 2007).

46. *Id.* (emphasis added) (citation omitted).

following pre-BAPCPA practice, it would not have needed to add this new language. Under pre-BAPCPA practice, a debtor's disposable income had always been used to pay priority claimants first, and then the balance went to the nonpriority creditors class. Thus, it clearly intended to signal a change. Interpreting the phrase to provide for the deduction of all priority claims once, but not twice, gives meaning to this phrase, without making Chapter 13 unworkable for below-median income debtors.

But is such an interpretation an impermissible "rewriting" of the statute? The Tenth Circuit has held that a court may deviate from the plain language of a statute only where applying the plain language would produce an absurd result:

> If the language of a statute is clear in its application, the general rule is that we are bound by it. Nevertheless, where applying the plain language "would produce an absurd and unjust result which Congress could not have intended," we need not apply the language in such a fashion. This is because "interpretations of a statute which would produce absurd results are to be avoided if alternative interpretations consistent with the legislative purpose are available." This absurdity exception to the plain language rule is consistent with the doctrine that "the function of the courts … [is] to construe … [statutory] language so as to give effect to the intent of Congress." Although the absurdity doctrine is "exceptional" in character, we have applied it where construing the plain language of a statute would produce an illogical result.[47]

This Court has never before found the plain language used by Congress to produce an absurd result. It does so here only with great hesitation. But to avoid producing an illogical reading of the Code, the Court adopts an interpretation of the phrase "to unsecured creditors" that allows debtors to subtract all of their priority claims in determining the amount of their PDI. The resulting figure must then be paid only to the nonpriority unsecured creditors.

■ Applying this construction, the Court finds that the Birdwell plan violates the "unsecured creditor" requirement. Ms. Birdwell has offered to pay $20,400 under her plan. This amount represents slightly more than her PDI of $318.09, as set forth on her Form 22C, multiplied by 60 months, or $19,085.40. But her plan proposes to use this amount first to pay her priority claims (attorney's fees and Trustee's compensation), and then only the balance of $15,586 will be paid to the nonpriority unsecured creditors. This Court holds that Ms. Birdwell must calculate her PDI according to Form 22C ($318.09) and then include a further deduction granted by statute (but omitted from Form 22C) that represents the amount of unpaid attorney's fees and costs, divided by 60 (or $46.23). The resulting figure of $271.86 must be multiplied by the ACP (60 months) and this "pot" ($16,311.60) must be paid to the Class Four creditors only.

■ The plans proposed in the Keller and Williams cases also follow the pre-BAPCPA practice of deducting the priority claims from the net income figure, and offering only the balance to the nonpriority unsecured creditors. For instance, in the Keller case, the Debtor proposes to pay $39,732, but he uses this pot to pay his administrative creditors and approximately $27,000 toward a priority tax debt, leaving only $6,712 for the Class Four creditors. But unlike the Birdwell case, both Keller

---

47. *Robbins v. Chronister,* 402 F.3d 1047, 1050 (10th Cir.2005) (citations omitted).

and Williams have a negative disposable income figure on Form 22C. The Trustee has not objected to any of the calculations appearing on their forms, nor does the Court have reason to question these calculations. Since these forms indicate a negative PDI, their plans are not required to pay any amount "to the unsecured creditors" because zero multiplied by 60 is still zero. Some courts have held that § 1325(b)'s requirements are inapplicable to a case in which the debtor has no PDI.[48] Whether § 1325(b) is inapplicable, or whether the Court merely deems the statute satisfied, the end result is the same. The Keller and Williams plans do not run afoul of the "unsecured creditor" requirement because they have negative disposable income.

## C. ACP and Plan Duration

■ The Trustee has objected to the Keller and Williams plans on the basis that these above-median income Debtors have not committed to pay their PDI over a five-year period. Section 1325(b)(1)(B) requires a debtor to pay all his PDI "to be received in the applicable commitment period." Section 1325(b)(4) defines ACP differently, depending on the debtor's income. For above-median income debtors, the ACP is five years.[49] For below-median debtors, it is three years.[50] The ACP may be "less than 3 or 5 years, whichever is applicable under subparagraph (A), but only if the plan provides for payment in full of all allowed unsecured claims over a shorter period."[51] The Trustee argues that the ACP concept imposes a temporal requirement, requiring the term of these plans to extend over five years. Keller and Williams argue that ACP is a multiplier to be used in the formula of "PDI × ACP," establishing a debtor's monetary obligation.[52] Courts are divided on this issue as well.[53] There is persuasive reasoning supporting each view, but this Court adopts the monetary view. While the term ACP viewed in isolation may be ambiguous, it is clarified by the remainder of the statutory scheme, where the term's function and relationship demonstrate that it is to serve as part of a formula.

In considering the overall Chapter 13 statutory scheme, it bears noting that ACP only exists in relationship to PDI. If Congress intended ACP to set the minimum term of a plan, the Court would have expected it to have appeared in a statute that is applicable to all Chapter 13 cases. Instead it only appears in

---

48. *See In re Kagenveama,* 527 F.3d 990, 998–1000 (9th Cir.2008), *amended by* 541 F.3d 868 (9th Cir.2008); *In re Frederickson,* 375 B.R. 829, 835 (8th Cir. BAP 2007).

49. 11 U.S.C. § 1325(b)(4)(A)(ii).

50. 11 U.S.C. § 1325(b)(4)(A)(I).

51. 11 U.S.C. § 1325(b)(4)(B).

52. For a discussion of the different interpretations, see Alane A. Becket and Thomas A. Lee III, *Applicable Commitment Period: Time or Money?,* 25 Am. Bankr.Inst. J. 16 (Mar.2006); and Evan J. Zucker, *The Applicable Commitment Period: A Debtor's Commitment to a Fixed Plan Length,* 15 Am. Bankr.Inst. L.Rev. 687 (Winter 2007).

53. For cases subscribing to the temporal view see, for example, *In re Fridley,* 380 B.R. 538, 544 (9th Cir. BAP 2007); *In re Wiegand,* 386 B.R. 238, 241 (9th Cir. BAP 2008); *In re Slusher,* 359 B.R. 290 (Bankr.D.Nev.2007); *In re Nance,* 371 B.R. 358 (Bankr.S.D.Ill. 2007); *In re Alexander,* 344 B.R. 742 (Bankr. E.D.N.C.2006); *In re Beckerle,* 367 B.R. 718 (Bankr.D.Kan.2007); and *In re Davis,* 348 B.R. 449 (Bankr.E.D.Mich.2006). For cases adopting the monetary view see, for example, *In re McGillis,* 370 B.R. 720 (Bankr. W.D.Mich.2007); *In re Swan,* 368 B.R. 12 (Bankr.N.D.Cal.2007); *In re Brady,* 361 B.R. 765 (Bankr.D.N.J.2007); and *In re Fuger,* 347 B.R. 94 (Bankr.D.Utah 2006).

§ 1325(b). This subsection is only applicable when a trustee or unsecured creditor objects to confirmation, when there are unsecured creditors, and when a debtor has PDI. Conversely, if there are no unsecured creditors, there is no obligation to pay PDI over the ACP. If there is no PDI, there is no triggering of the ACP requirement.[54] ACP is "exclusively linked to § 1325(b)(1)(B) and the 'projected disposable income' calculation."[55] So, if a debtor is required to pay additional funds to satisfy the best interest of creditors test or for other reasons, those additional contributions do not have to be paid out over the ACP.[56] Thus, the statutory placement of the ACP requirement, found only in § 1325(b), supports the monetary interpretation.

By way of contrast, § 1322(d), which is applicable to all Chapter 13 cases, sets forth the Code's requirements for plan duration. Rather than setting a minimum plan duration, § 1322(d) establishes the maximum length of a plan. For above-median income debtors, a plan may not exceed 5 years.[57] For below-median income debtors, a plan may not exceed 3 years, "unless the court, for cause, approves a longer period, but the court may not approve a period that is longer than 5 years."[58] Section 1322(d) was substantially modified by BAPCPA, but Congress did not eliminate these limits on plan duration. If ACP establishes a rigid requirement for plan length, then there would have been no reason for Congress to have set a maximum plan length for above-median income debtors in § 1322(d). Thus, the temporal view renders § 1322(d) superfluous, if it does not outright contradict it.[59]

The same is true with § 1329(c), which provides that a plan modified under § 1329:

> may not provide for payments over a period that expires after the applicable commitment period under § 1325(b)(1)(B) after the time that the first payment under the original confirmed plan was due, unless the court, for cause, approves a longer period, but the court may not approve a period that expires after five years after such time.

Again, Congress amended this subsection in BAPCPA but retained the concept of a maximum plan length of five years. If ACP had been intended to impose a rigid 5-year length, then it would have been unnecessary to state that the plan could not be extended longer than five years.

In addition, § 1328(f) would be rendered meaningless or of little import if the Court were to adopt the temporal interpretation. Section 1328(f) bars repeat discharges for at least two years in back-to-back Chapter 13 cases. It prohibits a court from granting a discharge to a debtor who has received a discharge in a previous Chapter 13 case filed within two years of the filing date of the second Chapter 13 case. Under the temporal view, it would be impossible to obtain a discharge within two years, because the minimum plan duration would be three years, except in those rare cases that would permit payment of unsecured creditors in full in less time. Thus, interpreting ACP as a monetary concept better preserves the meaning of § 1328(f).

---

**54.** *See In re Kagenveama,* 527 F.3d 990, 998–1000 (9th Cir.2008), *amended by* 541 F.3d 868 (9th Cir.2008); *In re Frederickson,* 375 B.R. 829, 835 (8th Cir. BAP 2007).

**55.** *In re Kagenveama,* 527 F.3d at 998.

**56.** *Id.*

**57.** 11 U.S.C. § 1322(d)(1).

**58.** 11 U.S.C. § 1322(d)(2).

**59.** *In re Frederickson,* 375 B.R. 829, 835 (8th Cir. BAP 2007).

Proponents of the temporal view argue that the monetary view renders § 1325(b)(4)(B) superfluous. This subsection allows a debtor to shorten the ACP to less than 3 or 5 years, whichever is applicable, "but only if the plan provides for payment in full of all allowed unsecured claims over a shorter period." They read this subsection as only allowing a shorter plan duration when the debtor pays its creditors in full. But the monetary view interprets § 1325(b)(4)(B) as a "cap" on the amount that would otherwise be required under § 1325(b)(2), guarantying that a debtor will never be required to pay more than is necessary to fund a 100% payment to unsecured creditors.[60] In other words, if the formula of "PDI × ACP" would require a debtor to pay $50,000, but he only owes his unsecured creditors $30,000, then § 1325(b)(4)(B) provides a "cap" to allow this debtor to confirm a plan that only provides $30,000 to his unsecured creditors.

The temporal view proponents also argue that the monetary interpretation gives little meaning to § 521(f) and § 1329(a)(1). Section 521(f) requires a Chapter 13 debtor to provide parties in interest and the trustee with copies of post-petition tax returns and financial statements, presumably so that they can review a debtor's financial situation and seek to increase a debtor's plan payments post-confirmation. Section 1329(a)(1) permits modification of a confirmed plan to, among other things, *increase* the amount of payments to a particular class of creditors. They argue that, if debtors are required merely to complete a worksheet to calculate a dollar amount owed to unsecured creditors, then there is little point in monitoring a debtor's post-petition financial situation as contemplated by § 521. In fact, a debtor could cash out his plan by paying the predetermined amount and be protected from post-petition modifications because the plan would be complete.

It is true that the peculiarities of the post-BAPCPA § 1325(b) calculations may allow a debtor to complete a plan in a much shorter period than 3 or 5 years. While this has always been possible, it is ironic that BAPCPA has increased the potential for accelerated plan completion. In changing the income component for the § 1325(b) disposable income calculation, "[c]ertain debtors [may] find themselves in the fortunate situation of earning more at the time of plan confirmation than what was indicated by [the historical average]. Consequently, it should be no surprise that these debtors are taking advantage of previously unavailable opportunity to complete their plans in less time than was typically needed prior to BAPCPA."[61]

Pre–BAPCPA, courts were divided on the issue of whether a debtor could complete his plan in less than three years without paying unsecured creditors in full.[62] It was a rare case in which the debtor could convince his creditors and the Chapter 13 trustee that he had proposed a budget that had squeezed out every possible dollar to pay creditors and, at the same time, allowed him to live on less and save the difference to accelerate a payoff of his plan obligations. This issue has arisen more frequently in the context of a debtor who has sold an asset, usually the family home, realizing sufficient funds to retire his plan commitment. This tension in the Code between a trustee or unsecured cred-

---

**60.** *See In re McGillis*, 370 B.R. 720, 735 (Bankr.W.D.Mich.2007); *In re Swan*, 368 B.R. 12, 25 (Bankr.N.D.Cal.2007).

**61.** *In re McGillis*, 370 B.R. at 739.

**62.** *See In re Swan*, 368 B.R. at 26 (and cases cited therein); *In re Fuger*, 347 B.R. 94, 101 (Bankr.D.Utah 2006).

itor's right to request a post-confirmation modification to require an increase in payments, and a debtor's ability to make an early payoff, existed pre-BAPCPA. It arises from the language used in § 1329(a), which provides that: "[a]t any time after confirmation of the plan, *but before the completion of payments* under such plan, the plan may be modified, upon request of the debtor, the trustee, or the holder of an allowed unsecured claim, to— (1) increase or reduce the amount of payments on claims of a particular class provided for by the plan. . . ." This seeming contradiction exists because, on one hand, this statute allows the trustee to seek an increase, but on the other hand it contemplates that once the debtor has paid all that his current plan requires, he can no longer be subject to the increase. In adopting the monetary view, one court has reconciled the apparent contradiction as follows: "[i]f Congress had meant to require a case to remain open for a specified time rather than until a specified amount of money is paid, it would have permitted plan modification until that specified time had passed. Instead, § 1329(a) cuts off the right to seek modification of a plan when the payments are completed, not after the expiration of the [ACP]." [63]

Proponents of the monetary view also find it difficult to imagine that Congress would have intended to impose a temporal requirement that would make Chapter 13 more onerous than Chapter 11.

Given that the individual Chapter 11 requirements were apparently intended to achieve the same results as Chapter 13, any Chapter 11 plan that distributes the number of dollars derived by multi-

plying the annualized disposable income by three or five years ought to be confirmable. Also, this parallel structure ought to illuminate the meaning of "applicable commitment period" in Chapter 13—it is merely the number of years to multiply by the annualized disposable income to generate the required plan payment, just as the multiplier functions in Chapter 11. . . . .

If "applicable commitment period" did in fact impose a minimum Chapter 13 plan length, but § 1129(a)(15) did not, then a debtor who wants to pay his plan off sooner could simply convert to Chapter 11 if the objection is raised. It is difficult to fathom why Congress would have intended that result. Why would Congress make Chapter 13 more difficult than Chapter 11, by imposing a minimum plan term that is longer than would be required in a Chapter 11? [64]

The monetary interpretation also resolves and harmonizes a related issue with which courts have had to grapple—whether the concept of an ACP is relevant to debtors with no disposable income. "In other words, we need income to be received and creditors to be paid if the ACP, whether 3 or 5 years, is to have any significance. If there are no unsecured creditors, § 1325(b)(1)(B) is rendered obsolete. Similarly, if there is no projected disposable income to be received, the statute has no more meaning than if there were no creditors to be paid." [65] Courts subscribing to the temporal interpretation sharply disagree as to whether a debtor with zero or negative disposable income is subject to the ACP requirement. Some of the tem-

63. *In re Mathis*, 367 B.R. 629, 635 (Bankr. N.D.Ill.2007).

64. Hon. Randolph J. Haines, *Chapter 11 May Resolve Some Chapter 13 Issues*, 8 Norton Bankr.L. Adviser 1 (August 2007).

65. *In re Green*, 378 B.R. 30, 35 (Bankr. N.D.N.Y.2007).

poral view courts conclude that there is no reason to artificially extend a plan for five years if a debtor was under no obligation to pay unsecured creditors. In their view, without disposable income, § 1325(b)(1) is inapplicable.[66] Others conclude that the definition of ACP does not make an exception for above-median debtors with no PDI and that, as a result, the debtor must remain in the plan and subject to court supervision for the full term of the ACP.[67] Adoption of the monetary interpretation obviates the need to answer this question as zero multiplied by either three or five is still zero.

Finally, public policy supports the monetary interpretation. Treating the ACP requirement as part of a formula allows the possibility that a debtor will pay off his unsecured creditors more quickly. The present value of a "pot" paid over three years is greater than the same amount spread out over five years. A shorter plan also reduces the chances of a default on plan payments. It furthers the Code's fresh start policy, allowing debtors to fulfill their obligations in a shorter amount of time, receive their discharge, and move on. "In sum, everyone benefits under the monetary approach in the vast majority of cases. More debtors will receive fresh starts more quickly. Creditors will be paid more money, more quickly, on their claims, and the entire bankruptcy system will be easier to administer and much more efficient." [68]

In the Keller case, the Debtor has multiplied his monthly payment of $903 by only 44 months. In Williams, the Debtor has proposed a sliding scale amount, based presumably on her actual income, but only

for a total of 36 months. The Trustee is correct in her argument that these above-median Debtors must use a 60–month calculation. But because Keller and Williams have negative disposable income, they have no obligation under § 1325(b) to pay their unsecured creditors any amount, since zero multiplied by 60 is still zero. Consequently, despite the improper use of 44 and 36, respectively, as the multiplier, their plans have proposed to pay the Class Four creditors more than is required by § 1325(b).

### D. The Continued Relevance of a Debtor's Ability to Pay in a Good Faith Analysis

At oral argument, the Trustee argued for the first time that these Debtors' ability to pay their unsecured creditors should be considered by the Court as part of the good faith requirement set forth in § 1325(a)(3), regardless of whether they have complied with § 1325(b). Section 1325(a)(3) provides that a court shall approve a proposed Chapter 13 plan if "the plan has been proposed in good faith and not by any means forbidden by law." Under the Trustee's view, even if a Debtor has met the PDI and ACP requirements of § 1325(b), evidence that the Debtor has the ability to pay more to creditors than the plan proposes demonstrates bad faith and precludes confirmation.

In this circuit, a court must make a determination of good faith on a case-by-case basis, looking at the totality of the facts and circumstances of the particular case, and considering a list of fourteen, non-exclusive factors first set forth in

---

**66.** *See, e.g., In re Alexander,* 344 B.R. 742, 751 (Bankr.E.D.N.C.2006).

**67.** *See., e.g., In re Nance,* 371 B.R. 358 (Bankr.S.D.Ill.2007).

**68.** *In re Swan,* 368 B.R. 12, 26 (Bankr. N.D.Cal.2007).

*Flygare.*[69] The first *Flygare* factor concerns the amount of the proposed payments and the amount of the debtor's surplus. In this way, the good faith analysis appears to overlap the requirements set forth in § 1325(b), because both sections address whether the debtor is committing sufficient income to the plan.

This apparent overlap between § 1325(a)(3) and § 1325(b) has been a subject of dispute for many years. When § 1325(b) was first added to the Code in 1984, some courts held that its adoption narrowed the focus for determining good faith under § 1325(a)(3), because the factors related to the debtor's ability to pay previously considered under the totality of the circumstances test were subsumed by the ability-to-pay test adopted in § 1325(b).[70] Other courts, including the Tenth Circuit, continued to consider a debtor's ability to pay as one of many relevant factors in the totality of the circumstances test.[71]

BAPCPA's amendment of § 1325(b) has, as one court put it, "rekindled this debate by creating situations where the debtor can meet the objective standard imposed by [§ 1325(b)] without actually having to commit to his plan all that he can at least currently afford."[72] Some courts have concluded that, when BAPCPA created a bright line test for determining PDI under § 1325(b), Congress even more clearly indicated that it intended § 1325(b), rather than the good faith test, to be the measure of whether the debtor was committing sufficient income to the plan.[73] Under this view, technical compliance with the provisions of § 1325(b) precludes a finding of bad faith or, in other words, creates a safe harbor for debtors.[74] Other courts, similar

---

69. *Flygare v. Boulden,* 709 F.2d 1344, 1347–48 (10th Cir.1983) (listing eleven factors). The Tenth Circuit added three additional factors to the *Flygare* list in *In re Rasmussen,* 888 F.2d 703, 704 n. 3 (10th Cir.1989). The fourteen factors are: (1) the amount of the proposed payments and the amount of the debtor's surplus; (2) the debtor's employment history, ability to earn and likelihood of future increases in income; (3) the probable or expected duration of the plan; (4) the accuracy of the plan's statements of the debts, expenses and percentage repayment of unsecured debt and whether any inaccuracies are an attempt to mislead the court; (5) the extent of preferential treatment between classes of creditors; (6) the extent to which secured claims are modified; (7) the type of debt sought to be discharged and whether any such debt is non-dischargeable in Chapter 7; (8) the existence of special circumstances such as inordinate medical expenses; (9) the frequency with which the debtor has sought Bankruptcy relief; (10) the motivation and sincerity of the debtor in seeking Chapter 13 relief; and (11) the burden which the plan's administration would place upon the trustee; (12) whether the debtor has stated his debts and expenses accurately; (13) whether the debtor has made any fraudulent misrepresentation to mislead the bankruptcy court; and

(14) whether the debtor has unfairly manipulated the Bankruptcy Code.

70. *See In re Barr,* 341 B.R. 181, 183–185 (Bankr.M.D.N.C.2006) (collecting cases); *In re Thompson,* 116 B.R. 794, 796 (D.Colo. 1990).

71. *See In re Gier,* 986 F.2d 1326, 1328–29 (10th Cir.1993) (considering proposed plan payment in comparison to monthly surplus as part of good faith analysis); *In re Young,* 237 F.3d 1168, 1175 (10th Cir.2001) (considering whether debtor's purchase of used Cadillac with significant monthly payment represented an attempt by debtor to manipulate his expenses); *In re Loper,* 367 B.R. 660, 669–70 (Bankr.D.Colo.2007) (noting that the Tenth Circuit never limited the good faith test under *Flygare* to preclude an analysis of the debtor's expenses and resulting plan contribution).

72. *In re McGillis,* 370 B.R. 720, 740 (Bankr. W.D.Mich.2007).

73. *E.g., Mancl v. Chatterton (In re Mancl),* 381 B.R. 537, 542–43(W.D.Wis.2008).

74. *See In re Alexander,* 344 B.R. 742 (Bankr. E.D.N.C.2006) (calculation of debtor's dispos-

to the Trustee's argument in this case, hold that a debtor's duty under § 1325(a)(3) to propose a plan in good faith ultimately requires a debtor to commit whatever he or she can afford, regardless of what § 1325(b) might otherwise dictate.[75]

Still other courts take a more intermediate approach, concluding that where a debtor complies with § 1325(b), the sufficiency of the assets devoted to the plan is not a basis for a finding of lack of good faith under § 1325(a)(3), unless there is a showing of some sort of manipulation, subterfuge or unfair exploitation of the Code by the debtor.[76] Courts adopting this approach take guidance from the Chapter 7 counterpart found in § 707(b)(3).[77] That section requires a court to consider the existence of bad faith of a Chapter 7 debtor and/or whether the totality of the circumstances of the debtor's financial situation demonstrates abuse, even where the debtor has otherwise met the objective requirements of the Means Test.[78] Similarly, the intermediate approach reasons, § 1325(a)(3) allows for a more subjective analysis of a debtor's good faith and the totality of the circumstances, even where

the debtor has met the mechanical requirements of § 1325(b).

 This Court agrees with the intermediate approach. Thus, the primary measure of whether the debtor has committed sufficient income to the plan is the PDI analysis of § 1325(b). This means that, in the majority of cases, a debtor need not commit any more funds to pay unsecured creditors than is required by § 1325(b)(1) in order for the plan to be filed in good faith. But the passage of BAPCPA did not wholly eliminate consideration of a debtor's ability to pay in the context of a good faith analysis under § 1325(a)(3).[79] In the absence of Tenth Circuit precedent to the contrary, this Court will continue to review plans to determine if the proposed plan constitutes "an abuse of the provisions, purpose or spirit of Chapter 13."[80] For example, a debtor who deducts substantial amounts of secured debt for luxury items on Form 22C may technically comply with § 1325(b), but be unable to demonstrate that a plan offering only minimal or no payments to unsecured creditors was proposed in good faith.[81] On the other hand,

able income must be determined under § 1325 and is not an element of good faith); *In re Farrar–Johnson,* 353 B.R. 224 (Bankr. N.D.Ill.2006) (good faith is still a factor in confirmation but the calculations on Form B22C create a safe harbor).

**75.** *See In re Upton,* 363 B.R. 528, 536 (Bankr. S.D.Ohio 2007); *In re Anstett,* 383 B.R. 380 (Bankr.D.S.C.2008).

**76.** *See In re Briscoe,* 374 B.R. 1, 20–21 (Bankr.D.D.C.2007) (recognizing exception for debtors "engaging in subterfuge so blatant as to indicate that they have 'unfairly manipulated the Bankruptcy Code, or otherwise proposed [their] Chapter 13 plan in an inequitable manner.' " (quoting *In re Goeb,* 675 F.2d 1386, 1390 (9th Cir.1982))).

**77.** *In re Briscoe,* 374 B.R. at 21; *In re McGillis,* 370 B.R. at 749–50.

**78.** *E.g., In re Scarafiotti,* 375 B.R. 618, 636 (Bankr.D.Colo.2007).

**79.** *See In re Martin,* 373 B.R. 731, 736 (Bankr.D.Utah 2007) ("To confirm a plan the Court must find that a debtor complies with both [§ 1325(b) and § 1325(a)(3)].").

**80.** *See Flygare v. Boulden,* 709 F.2d 1344, 1347 (10th Cir.1983) ("[T]he amount of the proposed repayment to unsecured creditors is only one of the many factors which the courts must consider in determining whether the plan meets the statutory good faith requirement.").

**81.** *E.g., In re Martin,* 373 B.R. at 734–36 (although debtor properly deducted secured debt payments on ski boat and vehicles, debtor's proposed plan to retain ski boat and vehicles while paying unsecured creditors a

the Court would not expect to hear challenges to a debtor's good faith in proposing a plan merely because the debtor could pay an additional $50 in months 49 through 60 of the plan. Undoubtedly, it would be helpful to practitioners to articulate an objective test for a good faith analysis based on a debtor's ability to pay more to his unsecured creditors. Unfortunately, good faith will always remain a subjective test. But it should be used only to ferret out those debtors "engaging in subterfuge so blatant as to indicate that they have 'unfairly manipulated the Bankruptcy Code, or otherwise proposed [their] [c]hapter 13 plan in [such] an inequitable manner' [that they] will run afoul of § 1325(a)(3)."[82] Thus, the best guidance this Court can offer is the old adage of "pigs get fat, but hogs get slaughtered."

 In these cases, the Trustee failed to make any specific allegations of bad faith under § 1325(a)(3), other than the ability of these Debtors to fund a greater repayment plan. Thus, the only *Flygare* element implicated by her good faith objection is the first factor, which is the amount of the proposed payments and the amount of the debtor's surplus. The difference between these Debtors' proposed plan payments and their scheduled monthly net income, however, is relatively small and is not accompanied by any other evidence that they are attempting to manipulate the Code or mislead the Court in anyway. Accordingly, the Court overrules the Trustee's § 1325(a)(3) objection.

## III. CONCLUSION

For the foregoing reasons, the Court hereby:

A. Overrules the Trustee's objection to the Birdwell plan based on the Debtor's

failure to offer the net income indicated on her Schedule J, and to include a "step-up" in payments after the retirement of a car loan. The Court holds that the requirement to pay PDI was satisfied by proposing the disposable income set forth on her Form 22C.

B. *Sua Sponte* holds that the Birdwell plan violates § 1325(b)(1)(B)'s requirement that PDI be paid to "unsecured creditors," by offering to use the "pot" that is the product of PDI multiplied by the ACP to pay all priority claims, and leaving only the balance to pay the nonpriority creditor class. Instead she must calculate PDI according to Form 22C and then include a further deduction granted by statute (but omitted from the form) that represents the amount of unpaid attorney's fees and costs, divided by 60. The resulting figure must be multiplied by the ACP and this "pot" must be paid to nonpriority unsecured creditors only.

C. Overrules the Trustee's objection to the plans of Keller and Williams on the basis that their plans do not extend over a 5–year period. The Court holds that the ACP requirement in § 1325(b)(4) functions as a multiplier in a formula to determine the amount a debtor must contribute toward repayment of unsecured creditors, rather than imposing a rigid plan length. But because the Keller and Williams Debtors have negative disposable income on their Form 22C, it does not matter whether they have multiplied their PDI by 60 or some lesser number.

D. Overrules the Trustee's objection to these three plans on the basis of a lack of good faith under § 1325(a)(3) because the only evidence of bad faith offered was the failure to commit all of the Debtors' actual net income set forth on Schedule J. While

total of $500 was lacking in requisite good faith).

82. *In re Briscoe,* 374 B.R. at 22 (quoting *In re Goeb,* 675 F.2d 1386, 1390 (9th Cir.1982)).

holding that a debtor who satisfies the requirements of § 1325(b) may still be subjected to scrutiny under the good faith requirement of § 1325(a), the Court finds that there was insufficient evidence presented to indicate that these Debtors have attempted to abuse the Bankruptcy Code in proposing the plans at issue.

E. The Court DENIES confirmation of the Birdwell plan in its present form.

F. The Court CONFIRMS the Keller and Williams plans. A separate Order of Confirmation will issue in these two cases in due course.