**In re Dennis C. STITT, Jr., Debtor.**

**Bankruptcy No. 08–40386–JDP.**

United States Bankruptcy Court, D. Idaho.

Nov. 7, 2008.

Paula Brown Sinclair, Twin Falls, Idaho, Attorney for Debtor.

Kathleen A. McCallister, Kuna, Idaho, Chapter 13 Trustee.

## MEMORANDUM OF DECISION

JIM D. PAPPAS, Bankruptcy Judge.

### *Introduction*

In this case, the Court must decide whether a debtor's chapter 13[1] plan should be confirmed. After careful consideration of the record, the parties' arguments, and the applicable law, the Court concludes that confirmation must be denied.[2]

### *Procedural Background*

Debtor Dennis Stitt, Jr. ("Debtor") filed a petition for relief under chapter 13 of the Bankruptcy Code on May 14, 2008. Docket No. 1. Debtor's original plan, filed on the same day as his petition, proposed to make 60 monthly payments of $120 to the chapter 13 trustee for distribution to his

---

1. Unless otherwise indicated, all chapter and section references are to the Bankruptcy Code, 11 U.S.C. §§ 101–1532, and all rule references are to the Federal Rules of Bankruptcy Procedure, Rules 1001–9037.

2. This Memorandum constitutes the Court's findings of fact and conclusions of law. Fed. R. Bankr.P. 9014, 7052.

creditors. Docket No. 7. The chapter 13 trustee, Kathleen McCallister ("Trustee") objected to Debtor's original plan. She identified several of what she considered to be errors in Debtor's Official Form 22C, requested various documents to support the numbers listed in the Form, and opined that several of Debtor's listed expense items exceeded those in the IRS allowances.[3] Docket No. 25.

On July 16, 2008, Debtor amended his plan. Docket No 27. The amended plan proposed to make fewer payments to Trustee (i.e., now 30 monthly payments), but to increase the amount of each payment to $161. In addition, the amended plan proposed to sell two of Debtor's horses and contribute all sale proceeds to fund the plan. Trustee renewed her objection on the grounds that the amended plan did not pay unsecured creditors at least the liquidation value of Debtor's assets as required under § 1325(a)(4), and that the plan was not proposed in good faith as required by § 1325(a)(3). Docket No. 29. In addition, Trustee noted that Debtor had failed to correct the errors in Official Form 22C, and had not addressed excessive expenses for transportation and housing. Id. Following a hearing, the Court denied confirmation on Debtor's amended plan, but granted leave to Debtor to propose another amended plan. Docket No. 30.

Debtor filed his second amended plan on August 9, 2008, in which he proposed to make 60 monthly payments to Trustee. Docket No. 31. This plan contemplates initial monthly payments to Trustee of $120, with two step-ups in amount at later stages of the plan.[4] In addition, this plan proposes an annual payment of $1,500 in each of the first two years of the plan. Trustee objected to confirmation of this plan as well. Her objection explains that there are still errors in Debtor's Official Form 22C and Debtor has not addressed the high expenses claimed for housing and transportation. Docket No. 35. In addition, Trustee alleged that this plan was likewise not filed in good faith. Id. In response to Trustee's objection, Debtor amended schedules I and J, and Official Form 22C. Docket Nos. 37, 38.

On September 2, 2008, the Court conducted a confirmation hearing on Debtor's second amended plan. Documentary exhibits were admitted into evidence, and Debtor testified in response to questions from his counsel, Trustee, and the Court. At the close of the evidence, the parties requested to submit their closing arguments via briefs. This request was granted, and the parties have submitted their closing briefs. Docket Nos. 42–44.

### Facts

Debtor is employed full-time as an investigator by the Office of Personnel Management for the federal government, and is an officer in the Idaho National Guard. As a member of the military, Debtor has been deployed several times, both within the United States, and abroad. In 2004, Debtor was deployed to Iraq, where he was stationed for one year. Debtor is unmarried.[5]

---

3. Wells Fargo, a secured creditor, also filed a written objection to Debtor's original plan. See Docket No. 23. This objection was not renewed after subsequent amendments to the plan.

4. Prior to filing bankruptcy, Debtor received two separate loans from his Thrift Savings Plans. Payments for these loans are currently being automatically deducted from his pay-

checks. Both of these loans will be paid off during the term of Debtor's proposed plan. The increases in payments that Debtor proposes in his plan correspond to the dates when these loans will be paid in full.

5. In Debtor's view, his repeated military deployments ultimately resulted in a divorce from his spouse. Debtor separated from his

Upon his return from Iraq, Debtor resumed his work as an investigator for the federal government. He was transferred from his previous assignment in Northern Idaho, and although his territory now covers most of Southern Idaho, his principal duties are conducted at the Mountain Home Air Force Base and at Idaho National Laboratory in Idaho Falls.

Having recently returned from a foreign military deployment, Debtor testified that he was anxious to put down roots, and he attempted to find suitable living arrangements near Mountain Home. He testified that, at that time, he had good credit and was pre-approved for a $300,000 home construction loan. He investigated several home sites with sufficient acreage[6] near Mountain Home but, he explained, felt that land prices in the area were inflated. Debtor also testified that the climate around Mountain Home was too hot for his tastes. Instead, Debtor located a forty-acre parcel near Fairfield that was selling for $86,000, a price he felt was reasonable. A contractor estimated that it would cost $203,000 to build a three-bedroom house on the property. Debtor decided to purchase the land, construct the house, and obtained a loan from Wells Fargo to accomplish that end.

While the house was being constructed, Debtor borrowed additional funds so that he could construct a small shed and horse stables, and install a fence on the property. The house was completed in December, 2006. Debtor testified that because he

carefully monitored the construction, the total cost of the house was actually several thousand dollars below budget. However, by that time, he had incurred approximately $55,000 in unsecured debt. When Debtor sought to convert his construction loan into a conventional loan, he learned that the bank had added significant costs and fees to the balance due, which increased the financing cost by approximately $25,000. This higher cost significantly impacted Debtor's debt-to-income ratio, which in turn meant his new loan would carry a higher interest rate and monthly payments.[7]

Debtor testified that he knew that he needed to get out from underneath the construction loan, with its high interest rate, as quickly as possible. He attempted to find alternative financing, but each of the lenders he contacted declined to extend him a loan on better terms. Feeling that he had no other choice, Debtor ultimately returned to Wells Fargo and took out the mortgage loan with a higher principal balance and a higher interest rate than he had intended when he first decided to build the house.[8] Debtor testified that he knew he was facing financial trouble at that point, but was hopeful that he could refinance in the near future and weather his predicament. In spite of his hopes, because of the high cost of his mortgage, Debtor was unable to stay current on all of his other debt obligations, and began missing regularly scheduled payments on some of these debts.

---

spouse in February, 2003, and the divorce became final in June, 2004.

**6.** According to Debtor's sworn schedules, he owns four Alaskan huskies and four paint horses. Presumably, Debtor was looking for a home site with enough land to accommodate a house as well as his animals.

**7.** While the Court does not doubt that he was surprised by what occurred, Debtor was unable to adequately explain the nature of these additional bank costs and fees.

**8.** When Debtor first began constructing the house, he had expected his monthly payments to be approximately $1,750. The monthly principal and interest payment on the new loan is approximately $2,130.

In June, 2007, after only six months in the new house, Debtor attempted to secure a second mortgage, which he could use to pay off some of his unsecured debt which carried higher interest rates. He learned that because it had been more than six months since his house had been appraised, he would need to get a fresh appraisal to support any new loan. Although Debtor owed approximately $310,000 on the property, the new appraisal came back at only $303,500,[9] and Debtor was unable to qualify for a new loan.

Debtor has access to a government vehicle to use for work-related travel. Normally, when not using it in his work, Debtor is required to park the vehicle at the Mountain Home Air Force Base. Debtor explained that he travels to Mountain Home for work at least three times per week, a distance from his Fairfield home of approximately eighty miles. Ex. 102. Debtor also travels to Twin Falls one time each month for National Guard training. Twin Falls is approximately seventy-three miles from his residence. *Id.*

For the past few years, Debtor has attempted to breed and sell his horses. According to his testimony, Debtor has two geldings, one older mare, and a young filly. Only the younger filly will be used in the breeding business. Since beginning this enterprise, it appears that Debtor has only sold one foal.

In connection with his role as an investigator, Debtor has top-secret security clearance. In September, 2007, Debtor's security clearance came up for regular review. Debtor's financial difficulties complicated this process, which lasted several months, but he ultimately obtained a favorable rating in May, 2008, after he filed his bankruptcy petition. Debtor testified that a final condition of that adjudication was that he show proof that he had actually filed for bankruptcy, and that his financial situation would continue to be reviewed on an annual basis.

At the time his petition was filed, Debtor was one month delinquent on his mortgage, and had incurred approximately $70,000 in unsecured debt. Debtor proposed a sixty month plan, through which he intended to cure the mortgage arrearage, pay administrative expenses and Trustee's fees, and contribute the remaining balance to his unsecured creditors. Debtor sought to discharge those unsecured debts that remained unpaid at the conclusion of the plan pursuant to § 1328(a).

### Discussion

### I.

■ Trustee argues that Debtor's plan was not filed in good faith as required by § 1325(a)(3). To resolve this objection, as indicated to the parties at the confirmation hearing, the Court's primary concern is not whether Debtor filed his chapter 13 petition in bad faith, but rather whether his second amended plan is consistent with the overall policies of chapter 13 and was, therefore, proposed in good faith. *Compare* 11 U.S.C. § 1325(a)(7) (providing that "the court shall confirm a plan if ... the action of the debtor in filing the petition was in good faith;") *with* 11 U.S.C. § 1325(a)(3) (providing that "the court shall confirm a plan if ... the plan has been proposed in good faith and not by any means forbidden by law.").[10]

---

**9.** In December, 2006, when the house was completed, it was appraised at approximately $350,000.

**10.** While Trustee has not challenged Debtor on the point, there is ample evidence in the record to conclude that Debtor's chapter 13 filing was undertaken in good faith. The combination of Debtor's military deployment, marital problems, job transfer and relocation, and the various financial problems Debtor

■ Under the applicable case law, the model for determining whether a debtor's plan was proposed in good faith was clear-bankruptcy courts were to make that determination on a case-by-case basis, after considering the totality of the circumstances. *See Leavitt v. Soto (In re Leavitt)*, 171 F.3d 1219,1222–23 (9th Cir.1999); *In re Tucker*, 989 F.2d 328, 330 (9th Cir. 1993); *In re Goeb*, 675 F.2d 1386,1390 n. 9 (9th Cir.1982); *In re Yochum*, 96.2 I.B.C.R. 77, 78 (Bankr.D.Idaho 1996). Whether a debtor's plan was proposed in good faith was a question of fact. *Smyrnos v. Padilla (In re Padilla)*, 213 B.R. 349, 352 (9th Cir.BAP1997). The burden of establishing good faith rested on the debtor. *Id.*

■ In *Leavitt*, the Ninth Circuit held that in determining whether a chapter 13 petition or plan was proposed in good faith, a bankruptcy court should consider: (1) whether the debtor misrepresented facts in his petition or plan, unfairly manipulated the Code, or otherwise filed his petition or plan in an inequitable manner; (2) the debtor's history of filings and dismissals; (3) whether the debtor intended to defeat state court litigation; and (4) whether egregious behavior is present. 171 F.3d at 1224. Again, though, the issue in this case focuses not on Debtor's motivation in commencing his chapter 13 case, but rather, whether his plan was filed in good faith. In that regard, the Bankruptcy Appellate Panel has identified a nonexhaustive list of factors which bankruptcy courts should consider. Those factors include:

1) The amount of the proposed payments and the amounts of the debtor's surplus;

2) The debtor's employment history, ability to earn, and likelihood of future increases in income;

3) The probable or expected duration of the plan;

4) The accuracy of the plan's statements of the debts, expenses and percentages of repayment of unsecured debt, and whether any inaccuracies are an attempt to mislead the court;

5) The extent of preferential treatment between classes of creditors;

6) The extent to which secured claims are modified;

7) The type of debt sought to be discharged, and whether any such debt is nondischargeable in Chapter 7;

8) The existence of "special circumstances" such as inordinate medical expenses;

9) The frequency with which the debtor has sought relief under the [Bankruptcy Code];

10) The motivation and sincerity of the debtor in seeking Chapter 13 relief; and

11) The burden which the plan's administration would place upon the trustee.

*In re Padilla*, 213 B.R. at 352–53. This Court has previously employed this analytical paradigm as a guide in determining whether a chapter 13 plan has been proposed in good faith. *See In re Johnson*, 262 B.R. 831, 839 (Bankr.D.Idaho 2001) (finding that, on balance, debtor's chapter 13 plan was proposed in good faith).

■ But Debtor reminds the Court that time passes, and since the above decisions were made, Congress has amended the Code. *See* Bankruptcy Abuse Prevention and Consumer Protection Act of 2005 ("BAPCPA"), Pub.L. 109–8,119 Stat. 23 (Apr. 20, 2005). In light of the changes

encountered with the construction of his house in Fairfield, compel a finding that

Debtor was properly motivated in filing for bankruptcy relief.

brought about by BAPCPA, and the cases interpreting the amendments, such as the Ninth Circuit's recent decision in *Maney v. Kagenveama (In re Kagenveama)*, 541 F.3d 868 (9th Cir.2008), Debtor challenges the continuing vitality of the former "good faith" analytical model and insists it must be reexamined. Essentially, Debtor argues that by adopting a "means test" in BAPCPA, Congress has chosen a formulaic approach to determine whether chapter 13 plans should be confirmed, a methodology that promotes certainty and objectivity and is intended to displace the subjective, discretion-based "totality of the circumstances" test. Debtor argues that, unlike the "old days" when the bankruptcy court was called upon to make judgments about a debtor's lifestyle choices in deciding whether to confirm a plan, under BAPCPA's means test, a debtor's expenses "are what they are," and whether they could be lower if certain adjustments were made to the debtor's circumstances is simply not a relevant inquiry. Docket No. 42.

Trustee, though not specifically addressing *Kagenveama*, advocates retention of the case-by-case approach to determine whether a plan has been proposed in good faith. She explains that BAPCPA did not displace the requirement that a debtor's expenses must be "reasonably necessary." *See* 11 U.S.C. § 1325(b)(3). In short, because in constructing his going-forward budget Debtor attempts to deduct several expenses[11] from his monthly income which Trustee believes are not reasonably necessary, Debtor is not committing his entire disposable income to plan payments, and in her view, has not proposed his plan in good faith.

After carefully reviewing the Ninth Circuit's decision in *Kagenveama*, the Court is not persuaded that the changes wrought by BAPCPA require the Court to abandon the totality of the circumstances approach when determining whether a debtor's plan is proposed in good faith for purposes of § 1325(a)(3). Accordingly, the Court follows that approach in determining whether Debtor's plan should be confirmed in this case.

### II.

#### A.

At bottom, *Kagenveama* is a decision about statutory interpretation, not good faith. In it, the Ninth Circuit addressed the meaning of two phrases found in § 1325(b) as amended by BAPCPA: "projected disposable income" and "applicable commitment period" in connection with the bankruptcy court's determination whether a debtor's plan had provided that "all ... projected disposable income to be received in the applicable commitment period ... will be applied to payments to unsecured creditors under the plan." *Kagenveama*, 541 F.3d at 871.[12] Reduced to its essence, in its majority's opinion, the court reiterated that "disposable income" is a defined term in the Bankruptcy Code, but that "projected disposable income" is not. *Id.* at 872. Though not expressly defined, the court concluded that to determine a debtor's "projected disposable income," bankruptcy courts should start with a debtor's "disposable income" as defined by § 1325(b)(2), and project that amount over the "applicable commitment period." *Id.* In reaching this conclusion, the Circuit declined to adopt the argument presented by the chapter 13 trustee that the "dispos-

---

**11.** Trustee is primarily concerned with the expenses associated with Debtor's housing, his transportation, and his horse-breeding business.

**12.** In this case, neither party disputes that Debtor is an above median income debtor or that the applicable commitment period is sixty months.

able income" calculation was intended merely as a "presumptive" starting point, to which additional evidence could be submitted to adjust this figure and arrive at a debtor's true "projected disposable income." *Id.* at 874. The Ninth Circuit noted:

> no text in the Bankruptcy Code creates a presumptively correct definition of "disposable income" subject to modification based on anticipated changes in income or expenses. In fact, the textual changes enacted by BAPCPA compel the opposite conclusion. The revised "disposable income" test uses a formula to determine what expenses are reasonably necessary. *See* 11 U.S.C. § 1325(b)(2)-(3). This approach represents a deliberate departure from the old "disposable income" calculation, which was bound up with the facts and circumstances of the debtor's financial affairs.

*Id.* (additional citations omitted).

Whatever the impact the above quoted language may have in determining whether a debtor has committed all of his or her "projected disposable income" to plan payments, the court's instructions say nothing about the pre-BAPCPA requirement under § 1325(a)(3) that, to be confirmed, a chapter 13 plan must also be proposed in good faith. In other words, while *Kagenveama* guides bankruptcy courts in interpreting certain new terms in the Code, it does not require them to retreat from the pointed, case-by-case analysis used to determine whether a plan has been proposed in good faith as formulated in its earlier decisions.

### B.

The apparent overlap between § 1325(a)(3) and § 1325(b) has long been a subject of dispute among bankruptcy courts. When § 1325(b) was first added to the Code, several courts concluded that its adoption narrowed the focus for determining good faith under § 1325(a)(3) because many of the factors previously considered under the totality of the circumstances test were subsumed in the "ability-to-pay" test embodied in § 1325(b). *See Noreen v. Slattengren*, 974 F.2d 75, 76 (8th Cir.1992) ("Most of these factors were 'subsumed' by 11 U.S.C. § 1325(b) ... which narrowed the focus of the bankruptcy court...."); *In re Smith*, 848 F.2d 813, 820 (7th Cir. 1988) (noting the adoption of § 1325 eliminated some of the old factors related to amount of plan payments). However, in spite of the new § 1325(b), other courts continued to regard a debtor's ability to pay creditors as one of the many important factors to be considered in the totality of the circumstances test. *See, e.g., In re Gier*, 986 F.2d 1326, 1328–29 (10th Cir. 1993) (considering proposed plan payments in comparison to monthly surplus as part of the good faith analysis); *In re Loper*, 367 B.R. 660, 669–70 (Bankr.D.Colo.2007) (noting that the Tenth Circuit never limited the good faith test to preclude an analysis of the debtor's expenses and resulting plan contribution).

The recent amendment of § 1325(b) occasioned by BAPCPA, has, as one bankruptcy court put it, "rekindled this debate." *In re McGillis*, 370 B.R. 720, 740 (Bankr.W.D.Mich.2007). In light of the amendment, some courts have held that technical compliance with § 1325(b) creates a safe harbor, and precludes a finding of bad faith. *See In re Alexander*, 344 B.R. 742, 752 (Bankr.E.D.N.C.2006) (finding that calculation of a debtor's disposable income must be determined under § 1325(b) and is not an element of good faith); *In re Farrar–Johnson*, 353 B.R. 224, (Bankr.N.D.Ill.2006) (good faith is a factor in confirmation, but the calculations on Form B22C create a safe harbor). At

the other end of the spectrum, other courts hold that § 1325(a)(3) ultimately requires a debtor to contribute all he or she can afford to pay creditors under a plan, regardless of what § 1325(b) might otherwise dictate. *See In re Anstett*, 383 B.R. 380, 385–86 (Bankr.D.S.C.2008); *In re Upton*, 363 B.R. 528, 536 (Bankr.S.D.Ohio 2007).

■ An intermediate approach has been adopted by several other courts. Under this approach, "the sufficiency of the assets devoted to the plan is not a basis for a finding of lack of good faith under § 1325(a)(3), unless there is a showing of some sort of manipulation, subterfuge or unfair exploitation of the Code by the debtor." *In re Williams*, 394 B.R. 550, 572 (Bankr.D.Colo.2008); *see also In re Briscoe*, 374 B.R. 1, 22 (Bankr.D.D.C.2007) (recognizing exceptions for debtors "engaging in subterfuge so blatant as to indicate that they have 'unfairly manipulated the Bankruptcy Code, or otherwise proposed [their] Chapter 13 plan in an inequitable manner.'" (quoting *In re Goeb*, 675 F.2d at 1390)). This approach recognizes that even where a debtor has satisfied the mechanical requirements of § 1325(b), a more subjective analysis of the debtor's good faith and the totality of the circumstances is mandated by § 1325(a)(3). *In re Williams*, 394 B.R. at 572.

■ In this Court's view, this intermediate approach makes the most sense, and reflects the distinct functions accomplished by § 1325(b) and § 1325(a)(3), in particular, and the policies of the Code in general. The "projected disposable income" requirement of § 1325(b) establishes a formula for calculating plan pay-

ments by deducting generic expense items from time-tested income. In contrast, the good faith requirement of § 1325(a)(3) gauges the overall fairness of a debtor's treatment of creditors under a plan, and prevents debtors seeking chapter 13 relief from treating their creditors inequitably. In other words, satisfying the "projected disposable income" rubric under § 1325(b) is not a reason to allow a debtor to unfairly prejudice creditors. The Court is persuaded by the wisdom in this approach, and will therefore continue to consider the totality of the circumstances when determining whether a debtor's plan is proposed in good faith.

### III.

The overriding theme of Trustee's argument is that while Debtor is seeking relief from the burden of his debts, he insists on maintaining a lifestyle that includes excessive expenditures for housing, transportation, and unprofitable business pursuits. She therefore challenges Debtor's good faith in proposing his plan for confirmation.

### A.

Compared to his income, Debtor's second amended plan proposes relatively small monthly payments to Trustee.[13] Debtor's most recent amended Official Form 22C shows he has no income in excess of the proposed plan payments. However, Trustee challenges the propriety of several expenses listed in the Form, which if reduced or eliminated, would allow Debtor to make substantially larger payments and pay all unsecured creditors in full during the term of his plan.

---

**13.** The plan proposes 42 monthly payments of $120, 11 monthly payments of $200, and 7 monthly payments of $240, as well as two annual payments of $1,500, for a total of $11,920 over the term of the plan. Debtor's annual salary as an investigator for the federal government is approximately $70,000 and his annual salary as an officer in the National Guard is approximately $12,000.

### 1.

■ At the heart of Trustee's concerns is Debtor's attempt to retain his current house and acreage with its attendant monthly expenses in excess of $2,300.[14] According to Debtor's schedules, Debtor is upside down as to this property. He reported that the value of the house and land was $305,000, and that he owed approximately $310,000 to the mortgage lender. Ex. 201. To service his monthly mortgage obligation and cover property taxes and insurance, Debtor pays more than four times the IRS allowable housing expense for a single person household in Camas County.[15]

In commenting upon the IRS standards which have been imported into the Code, one court explained:

> Section 1325(b)(3) should not be interpreted as categorically substituting the Section 707(b)(2) expense restrictions for the "reasonably necessary" expense requirement already imposed by Section 1325(b)(2). Rather, it should be interpreted as offering a further guideline for ensuring that the expenses claimed by an above-median-income debtor are reasonably necessary. *In re McGillis*, 370 B.R. at 729 (*citing In re McPherson*, 350

B.R. 38, 45 (Bankr.W.D.Va.2006)). This Court has previously found that a debtor's actual expenses must still be tested for reasonableness under the circumstances. *See, e.g., In re Meek*, 370 B.R. 294, 308 (Bankr.D.Idaho 2007) (explaining that in determining whether claimed expenses are proper, the proposals of both above– and below–median income debtors must be tested for reasonableness and necessity).[16]

Debtor's decision to maintain his Fairfield home is also problematic because its location necessitates his high transportation expense. Debtor's house is eighty miles from his primary place of employment in Mountain Home, and seventy-three miles from Twin Falls where he completes his monthly National Guard training. Debtor testified that he travels to Mountain Home on average three times per week, and to Twin Falls at least once per month, meaning that to commute to and from work each month, Debtor must travel approximately 2,250 miles. Debtor testified he drives a 1995 Dodge Ram pickup which gets approximately twelve miles per gallon. Debtor is not reimbursed for travel-related expenses in getting to and from work.[17]

14. Debtor's monthly housing expense is broken down as follows: principal and interest on mortgage—$2,130; property taxes—$137.88; property insurance—$70.83.

15. The IRS allowable housing expense for a single person household in Camas County is $565. *See* www.usdoj.gov/ust/.

16. In her closing argument, Debtor's attorney cited *Meek* for the proposition that this Court has confirmed the appropriateness of deducting actual mortgage expenses irrespective of their reasonableness. Debtor's assertion in this regard is incorrect. Although it is true that the Court in *Meek* allowed the debtors to deduct their entire actual mortgage expense when determining their disposable income, it did not hold that such would be proper in all

cases. Quite to the contrary, the Court carefully explained that when determining whether claimed expenses are proper, the proposals of both above and below median income debtors are "tested for reasonableness and necessity." *In re Meek*, 370 B.R. at 308.

17. Debtor testified that when he decided to build a house in Fairfield, he was under the impression that his primary employer would grant him "domiciliary parking," which would allow him to park his government-issued vehicle at his residence. Ultimately, his request for domiciliary parking was denied. Had the request been granted, Debtor's transportation expenses would be significantly less. It is understandable that Debtor made the decision to locate in Fairfield based upon this assumption. The reasonableness of

Some bankruptcy courts have refused, absent special circumstances, to allow debtors to claim transportation expenses in excess of the local IRS standards. *See, e.g., In re Tranmer*, 355 B.R. 234, 251 (Bankr.D.Mont.2006); *In re Renicker*, 342 B.R. 304, 309 (Bankr.W.D.Mo.2006). In *Tranmer*, the debtors sought to take an additional $180 per month expense based on the distance they needed to travel for work and for other personal reasons. The bankruptcy court explained, that absent special circumstances, debtors would be limited to the local IRS standards. *Tranmer*, 355 B.R. at 251. The court noted that special circumstances means "circumstances beyond a debtor's reasonable control ... [but it] does not include debtor's [sic] desire to remain living wherever they choose, even when their place of employment changes or requires a long commute." *Id.*

In this case, Debtor has carefully documented that he incurs actual monthly transportation expenses in excess of $800, over seventy-five percent of which are attributable to fuel costs. Exs. 102,104. However, Debtor has not identified any special circumstances that would persuade the Court to allow the additional $400 expense which Debtor requests in his budget for transportation.[18]

Is it inequitable for Debtor to ask his creditors to subsidize his decision to work in Mountain Home, but to live on an acreage in Fairfield in which he has no equity? Again, the record shows that Debtor understood that the bulk of his work responsibilities would be at the Mountain Home Air Force Base *before* choosing to purchase the land and build his house in Fairfield. It is not as if he was settled in a home, and only then informed that he would be reassigned to a new location farther away. All things considered, the Court concludes that Debtor's attempt to use chapter 13 to maintain his comparatively expensive residence in Fairfield, in which he has not equity, and which requires him to commute great distances to and from his employment, an inappropriate manipulation of the Code.

Debtor has not attempted to prove that adequate, cheaper housing is not available to him in areas nearer to his principal place of employment. Absent such proof, the Court presumes the cost to Debtor would likely be less than that required to maintain his current arrangements. Moreover, the Court finds that living closer to Mountain Home could substantially reduce Debtor's transportation expenses. Indeed, the Court suspects Debtor could generate significant additional monthly income for plan payments to his creditors if he would forego retention and ownership of the Fairfield acreage and seek housing closer to his job. Under these circumstances, Debtor's preference for a cooler climate and country home site must give way to his desire, and need, to reorganize his financial affairs. Such is the cost Congress expects debtors to bear in exchange for the many benefits of chapter 13 relief.

2.

▮ Trustee also argues that the expenses associated with Debtor's horse breeding business are not reasonably necessary and Debtor should not be allowed

his decision to remain in Fairfield, though, must be tested by his new financial circumstances and the current facts.

18. Debtor claims the full amount of the local IRS standard for transportation on Line 27A of Official Form 22C, which is $211, plus an additional $200 for maintenance because his vehicles are more than seven years old. Ex. 1. Debtor also claims an additional $400 on Line 57 which represents that portion of Debtor's actual fuel cost which is above the local IRS standard.

to subsidize an unprofitable venture by reducing his plan payments.[19] Trustee and Debtor dispute whether this business operates at a profit. In support of his argument, Debtor offered a profit and loss statement spanning the period of August, 2007 to July, 2008. Ex. 106. That exhibit shows that the only income generated during that period was from the sale of a foal in August, 2007 for $1,000. During that same time, the expenses for feed, veterinary and farrier services amounted to $1,057, resulting in a net loss of $57.

Debtor explained, however, that these figures are somewhat misleading. The expenses listed in the exhibit are for two horses, but going forward, Debtor will only have one horse to breed. Thus, the expenses should be cut in half, and if Debtor is able to sell one foal every two years, the business should break even.

Although Debtor's argument sounds logical enough, it suffers from at least one serious flaw, in that the documented expenses do not include stud fees. Debtor's filly is not currently in foal. Debtor's male horses are gelded, so in order to breed his filly, he would presumably need to hire a stud and pay a fee. The record includes no evidence or testimony as to how much this fee would be, but that information is not crucial in this case. Assuming, *arguendo*, that Debtor is able to sell a foal every other year and his expenses remain approximately equal, Debtor's business would not break even as he suggests, but would still operate at a slight loss. When a stud fee is added to the expense column of the balance sheet every other year, the business is driven further into the red.

Absent proof that Debtor's horse breeding enterprise is a feasible, profitable venture, it is unfair to his creditors that he expect to continue it while in chapter 13. While working with these animals may provide recreation and personal satisfaction to Debtor, realistically viewed, the endeavor amounts to a potential drain on his pocketbook. Debtor's choice to continue pursuing this operation comes at the expense of his creditors, whose legitimate debts continue to go unpaid. Given these circumstances, a good faith approach to reorganization of his financial affairs would not endorse the use of funds otherwise available for plan payments to subsidize such an enterprise.

### B.

As previously indicated, Debtor's plan, schedules, and other submissions have been amended and revised several times. Each revision has come only as a targeted response to Trustee's objections to confirmation, though Debtor urges that the mistakes in earlier submissions were not intended to mislead the Court. At the hearing, Debtor testified that he spent several hours pouring over the documents with his attorney in an attempt to make them as accurate as possible. Notwithstanding this effort, it appears that the most recent version of Official Form 22C contains a lower figure for Debtor's income than was reported in earlier versions of the form. At the confirmation hearing, Debtor could not explain the discrepancy.[20]

Debtor proposes to pay a total of $11,920 into his plan. With this amount,

---

**19.** To be fair, according to the most recent version of Debtor's Official Form 22C on file, these expenses are listed on Line 60 and are not currently being deducted when calculating Debtor's monthly "disposable income." *See* Docket No. 38; Ex. 1.

**20.** Debtor's counsel did not address this point in her closing arguments, and it remains unclear to the Court why it should be so difficult for Debtor to provide accurate information about his income in this regard, and why this figure has changed in the various forms.

Debtor proposes to cure his mortgage arrearage and pay both his attorney's fees and the Trustee's fee. The balance is to be disbursed to unsecured creditors. Debtor's schedules document approximately $70,000 in unsecured debt. Ex. 201. After payment of administrative expenses and the mortgage arrearage, there will be precious little remaining for Trustee to distribute to unsecured creditors.

### C.

█ In the context of a good faith inquiry, "special circumstances" are those which are beyond a debtor's reasonable control, such as a serious medical condition or a call to active duty in the military. *Tranmer,* 355 B.R. at 251. No special circumstances have been shown to exist in this case at this time.

Debtor is relatively young, healthy, and does not have any inordinate medical expenses. Debtor is not currently on active duty in the military, but, according to his testimony, he is scheduled to be deployed again in 2010. If he is deployed again, Debtor will no longer receive his salary as a federal investigator. However, Debtor does not anticipate the loss of this salary to create any hardship because, due to his length of service and rank, his military pay is slightly higher than his salary as an investigator. And while deployed, Debtor acknowledges he will have fewer living expenses. Debtor's military status and prospects for deployment do not presently constitute special circumstances justifying lower plan payments under these facts.

### D.

Having considered all appropriate factors, in the exercise of its discretion, the Court concludes that Debtor has not shown that his second amended plan is proposed in good faith. Instead, the Court is left with the firm conviction that Debtor,

although sincere in his need to reorganize his finances, is unwilling to engage in the kind of meaningful belt-tightening that could reasonably be expected from those earning as much as he does. Simply put, Debtor's plan does not provide equitable treatment to creditors as required by § 1325(a)(3). *See In re Yochum,* 96.2 I.B.C.R. at 78 (*citing In re Goeb,* 675 F.2d at 1390).

### Conclusion

Debtor's failure to adequately trim his monthly expenses demonstrates a lack of good faith and sincerity in attempting to deal with his creditors. Instead, Debtor's plan treats creditors inequitably.

Confirmation of Debtor's second amended plan will be denied by separate order. While Debtor will be given yet another opportunity to amend his plan, any such amended plan should accommodate the problems highlighted by the Court in this decision. If Debtor is unwilling or unable to propose a confirmable plan, Debtor should expect his case will be dismissed.